DON D'ANGELO, APPELLANT, v. SUE GARDNER, GEMCO, A DIVISION OF LUCKY STORES, INC., AND LUCKY STORES, INC., RESPONDENTS.

No. 20452

WESTERN STATES MINERALS CORP., A UTAH CORPORATION, APPELLANT, v. ROBERT C. JONES, AND GAIL A. JONES, HUSBAND AND WIFE, RESPONDENTS.

No. 19697

October 24, 1991 819 P.2d 206

*Eva Garcia,* Las Vegas, for Appellant Don D'Angelo.

*Smith & Kotchka,* Las Vegas, for Respondents Sue Gardner, GEMCO and Lucky Stores, Inc.

*E. Pierre Gezelin,* Reno; *Davis, Graham & Stubbs* and *Steven J. Merker* and *Richard A. Westfall,* Denver, Colorado, for Appellant Western States Minerals Corporation.

*Robert H. Perry* and *Janet J. Berry,* Reno, for Respondents Robert C. Jones and Gail A. Jones.

*Lionel Sawyer & Collins* and *Brian McKay,* Las Vegas, for Amici Curiae.

*Laxalt & Nomura,* Reno, for Amici Curiae.

*McDonald, Carano, Wilson, McCune, Bergin, Frankovich & Hicks,* Reno, for Amici Curiae.

*Raggio, Wooster & Lindell,* Reno, for Amici Curiae.

*Vargas & Bartlett,* Reno, for Amici Curiae.

*Woodburn, Wedge & Jeppson,* Reno, for Amici Curiae.

*Hamilton & Lynch,* Reno, for Amicus Curiae Nevada Trial Lawyers Association.

*Jones, Jones, Close & Brown* and *Charles H. McCrea, Sr.,* Las Vegas, for Amicus Curiae Southwest Gas Corporation.

*Thorndal, Backus, Maupin & Armstrong,* Las Vegas, for Amici Curiae REECo, EG&G and EMI.

# OPINION[1]

By the Court, SPRINGER, J.:

Having allowed rehearing and argument in regard to the above-captioned matters, the court now issues the following consolidated opinion and decision with regard thereto.

### D'ANGELO v. GARDNER, ET AL., DOCKET NO. 20452

This is a wrongful discharge case.[2] GEMCO claims that D'Angelo is an at-will employee and that he was subject to dismissal at any time without cause. D'Angelo claims that he is not subject to at-will termination but must, rather, be terminated only in accordance with the contract of the parties as evidenced by the handbook and in other ways.

This appeal comes to us on a summary judgment which holds, in effect, that D'Angelo was an at-will employee as a matter of

---

[1]Rehearings in the above-captioned appeals were granted pursuant to orders issued April 2, 1991. This opinion is issued on the rehearing.

[2]The trial court granted summary judgment to GEMCO on D'Angelo's claims for defamation. We have concluded that the trial court was correct in granting judgment to GEMCO on these claims and that D'Angelo's appeal on these points is without merit.

law. Because there are issues of fact that bear on the nature of D'Angelo's employment contract, we reverse the summary judgment.

In Southwest Gas Corp. v. Ahmad, 99 Nev. 594, 668 P.2d 261 (1983), a case very similar[3] to this one, we affirmed a summary judgment while recognizing that contractual obligations can be implicit in employer practices and policies as reflected in an employee handbook. When an employer issues an employee handbook containing termination provisions and the employee has "knowledge of the pertinent provisions therein," this "supports an inference that the handbook formed part of the employment contract of the parties." 99 Nev. at 595, 668 P.2d at 261.[4] In the case before us the employer issued a handbook containing provisions relating to termination of employment for cause, and delivered one of these handbooks to D'Angelo, who read and "acknowledged" its contents. These facts, as they did in *Ahmad,* support an inference that the termination provisions were part of the employment contract. In the face of such inference summary judgment should not have been granted.

In conformance with *Ahmad,* we must agree with D'Angelo that he should not be foreclosed by summary judgment from trying to establish what we have recently termed a "contractual obligation of continued employment."[5] The relationship of an

---

[3]The significant facts in this case are most similar to the facts in *Ahmad.* In *Ahmad* and in this case we hold only that an employee handbook might under certain circumstances be taken as evidence of an enforceable contract between an employer and employee. In neither of these cases do we say (as stated in the dissent) that "any determination by [an employer] to terminate an employee is contestable before a jury as a final arbiter of 'proper cause.' " "Proper cause" is not an issue before this court in this case. The issue here, as in *Ahmad,* is simply whether the employee should be denied his day in court and not allowed to present evidence that the parties decided to forego "at-will" status and enter into a contract relative to employment termination. The dissent quite correctly states that "[t]oday's opinion perpetuates the *Ahmad* rationale . . . ." Although the dissenting justices apparently are not pleased with the *Ahmad* "rationale," we could not decide the present case differently without overruling *Ahmad.*

[4]Of course, the employer can easily prevent this inference from arising by including in its handbook an express disclaimer of implied contractual liability of the type found in Perry v. Sears, Roebuck & Co., 508 So.2d 1086, 1088 (Miss. 1987). In *Perry,* the pension plan manual at issue stated in bold type, "Employment rights not implied," and further stated that "Participation in the plan does not . . . interfere in any way with the right of the company to discharge or terminate you at any time." In light of these statements, the court correctly found that no inference of implied contractual liability was present; thus, the court held that summary judgment was proper.

[5]Sands Regent v. Valgardson, 105 Nev. 436, 439, 777 P.2d 898, 899 (1989).

employer and employee may be such that the employer has a contractual obligation not to discharge the employee without first abiding by conditions relating to dismissal which are either expressly agreed upon by the parties or inferable from the dealings and practices of the parties. There is evidence to support this kind of employer-employee relationship in this case.

D'Angelo was employed by GEMCO as a salesman. Twelve years after he was hired, D'Angelo had risen to the position of department manager, employed in the East Sahara store in Las Vegas. In May of 1985, an incident occurred in which D'Angelo was accused of selling some film regularly priced at $3.97 a roll for $2.00 a roll. D'Angelo explained that he did this because the film date had expired. The outcome of this incident was that D'Angelo was terminated from his employment.

D'Angelo learned of the grounds for his termination when he saw a copy of GEMCO's letter to the state labor commissioner stating that D'Angelo had been terminated "for violation of work rule number 6, 'accepting or extending unauthorized discounts or credit to anyone.' " GEMCO's letter to the labor commissioner added: "As noted in the Handbook, which Mr. D'Angelo has read and acknowledged understanding of, deviation from this rule is considered most serious by the company and proper cause for discharge."

The foregoing language would lead one to believe that since both GEMCO and D'Angelo "acknowledged understanding" of the employee handbook, they may well have considered themselves, to some extent at least, bound by the terms of the handbook. GEMCO's written specification of charges given to the labor commissioner, although taken from the handbook, does not *of itself* establish the binding effect of the handbook because, even in the discharge of at-will employees, an employer may, in reporting to the labor commissioner, be called upon to specify the cause for dismissal[6]; however, GEMCO's reference to the handbook, the proclaimed "understanding" of the parties relative to the handbook, and GEMCO's reference to a rule violation taken from the handbook as being the cause of D'Angelo's dismissal, all tend to lead to the conclusion that the employment relationship was defined by the handbook and that both parties considered themselves bound by the handbook with reference to termination rights and processes.

At the time of his hiring, and as a condition of his being hired, D'Angelo was required to read and acknowledge his understanding of the employee handbook. The handbook deals with the

---

[6]GEMCO also acknowledged that D'Angelo had been dismissed for cause in a company bulletin describing the cause of discharge as being for "failure to follow company policies and guidelines."

subject of discharge and, in addition to referring to "proper cause" for dismissal, sets out in some detail the "primary reasons which are considered by GEMCO as *grounds for discharge*"; and *"any* discharge based on an employee's failure to perform work as required" must be "preceded by written notice to the employee."[7] (Our emphasis.) A jury could have concluded that both employer and employee intended to be bound by the terms of the handbook; but the jury could, of course, have concluded otherwise and decided in favor of GEMCO. The jury could have seen the handbook (as does the dissent) as a mere convenience to the employee and as a precatory expression of employment "policies intended to benefit employees," which was binding on the employee but not on the employer.

Just as there are cases in which handbooks and employment practices can be found to support an express or implied obligation of continued employment, so are there cases in which such an obligation is absent as a matter of law. This was the situation in our recent case of Vancheri v. GNLV Corp., 105 Nev. 417, 777 P.2d 366 (1989). In *Vancheri,* although there was an employee handbook, the handbook did not contain employee disciplinary procedures or specification of "proper cause" for dismissal (*see Vancheri,* 105 Nev. at 422 n.2, 777 P.2d at 369 n.2); thus, Mr. Vancheri could not rely on a handbook to support a claim on his part that his employer owed to him a contractual obligation of continued employment. Absent termination provisions in the handbook, we held in *Vancheri* that the mere existence of customary or informal procedures employed in cases of employee dismissal would not vitiate an essentially at-will employment.

In *Vancheri,* there was an established and customary disciplinary procedure that was ordinarily followed by the employer, but this procedure was gratuitous and unilateral and was not reduced to writing or incorporated in a handbook that was delivered to the employee and "acknowledged" by the employee. We said in *Vancheri* that the mere establishment of such procedures by an employer would not "in and of itself" create an obligation of continued employment. Such procedures, unilaterally installed, do not create the right of continued employment.

Mr. Vancheri failed, as a matter of law, to establish an agreement, express or implied, between his employer and him, that granted to him the right of continued employment. By contrast,

---

[7]GEMCO also argues that the procedures for dismissal do not apply to managerial personnel. This position is belied by the statement made by GEMCO in the bulletin mentioned in the body of the opinion, in which reference is made to "a Manager" who was "terminated for failure to follow company policies and guidelines." There is evidence to support a jury finding that the procedures for dismissal were available for managers as well as for other personnel.

as pointed out above, there is in the case before us ample evidence under our ruling in *Ahmad* "to support an inference" of the existence of an obligation of continued employment; and the granting of summary judgment to the employer in this case was in contravention of our holding in *Ahmad*. The language relating to termination contained in the employee-accepted GEMCO handbook, taken with the fact that D'Angelo's discharge was based on a handbook rule violation, would support a fact finder's conclusion that the employer was contractually bound to the employee under an obligation of continued employment.

Summary judgment is reversed; and the matter is remanded for trial on the merits of the wrongful discharge claims.

### WESTERN STATES MINERALS CORP. v. JONES, DOCKET NO. 19697

This is a wrongful termination of employment case. Respondent Robert C. Jones sued his employer, appellant Western States Minerals Corporation, in contract and tort because of the manner in which Western States terminated Jones's employment. The trial jury awarded Jones by general verdict $62,287.00 in past damages, $98,863.00 in future damages and $100,000.00 in punitive damages. We affirm the judgment of the trial court on the general verdict and hold that the evidence supports an award of contract damages and of tort damages, compensatory and punitive, for tortious discharge. We deny Jones's tort claim for breach of the implied covenant of good faith and fair dealing and decline any consideration of the assignment of error relating to the claim for infliction of emotional distress because it is not necessary to consider this claim to uphold the judgment.

#### Preliminary Comment Relating to Wrongful Discharge

The law relating to claims by employees against their employers for wrongful discharge is rapidly evolving and is often lacking in the clarity one would expect to find in the more static areas of judicial decision-making. For this reason we thought it useful to give a preliminary overview of the three discrete claims for relief which we consider in this opinion, namely, a claim for breach of contract, a claim for the tortious breach of the implied covenant of good faith and fair dealing which can arise out of certain employer-employee contractual relationships (sometimes called a "bad-faith discharge tort") and tortious discharge (sometimes called a "public policy tort").

1. *Breach of Employment Contract.* Employment contracts are ordinarily and *presumably* contracts which are terminable at

will; however, an employer may expressly or impliedly agree with an employee that employment is to be for an indefinite term and may be terminated only for cause or only in accordance with established policies or procedures. We have called this a contract of "continued employment" a contract which an employee can enforce in accordance with its terms.

2. *Bad Faith Discharge Tort.* This tort is committed when an employer, acting in bad faith, discharges an employee who has established contractual rights of continued employment and who has developed a relationship of trust, reliance and dependency with the employer. By its nature this kind of employer-employee relationship cannot develop in an at-will employment; consequently, a bad faith discharge tort cannot be committed against an at-will employee as can a tortious discharge.

3. *Tortious Discharge.* This tort, the so-called public policy tort, is the simpler of the two subject employment torts. An employer commits a tortious discharge by terminating an employee for reasons which violate public policy. "Although this kind of public policy tort cannot ordinarily be committed absent the employer-employee relationship, the tort, the wrong itself, is not dependent upon or directly related to a contract of continued employment such as that existing in the present case." K Mart Corp. v. Ponsock, 103 Nev. 39, 46, 732 P.2d 1364, 1369 (1987).[8] Discharging an employee for seeking industrial insurance benefits, for performing jury duty or for refusing to violate the law are examples of tortious discharge. *See, e.g.,* NRS 6.190; Hansen v. Harrah's, 100 Nev. 60, 675 P.2d 394 (1984).

Having defined the scope of the opinion, we now proceed to a discussion of the first matter of concern, liability for breach of the employment contract.

### Breach of the Contract of Continued Employment

We have concluded that the trial judge, the Honorable Joseph O. McDaniel, properly determined that there was sufficient evi-

---

[8]In *K Mart* under a heading of "Tort Liability" we referred to the application of general tort law to employee discharge cases and cited Hansen v. Harrah's, 100 Nev. 60, 675 P.2d 394 (1984) as the prototypical tortious discharge or public policy tort. *K Mart,* 103 Nev. at 45-47, 732 P.2d at 1368-69. Although we discussed tortious discharge in general terms, we did not hold that K Mart committed a public policy tort when it discharged Ponsock, a long-term, tenured employee, in order to deprive him of his retirement benefits. *K Mart* is a bad faith discharge case and not a tortious discharge case.

dence for the jury to find that there was a contractual obligation of "continued employment" between employer and employee. *Cf.* American Bank Stationery v. Farmer, 106 Nev. 698, 799 P.2d 1100 (1990); Sands Regent v. Valgardson, 105 Nev. 436, 777 P.2d 898 (1989). In both of the cited cases we recognized that an employee handbook can become "*a part* of the oral contract" between the parties. *Farmer,* 106 Nev. at 701, 799 P.2d at 1102 (emphasis supplied). In the case now at bar, the employment agreement appears to have been entered into when Jones signed a written agreement with Western States. At the time he was employed Jones was required to sign an agreement which said: "I agree that I will abide" by the terms and conditions set out in the company's *Employee Handbook* which was delivered to him at the time he was hired. Western States's mine manager, John Rice, specifically testified that the company's "employees have a right to rely on what Western States said in its employment manual." This provides evidence of the parties' contractual intent.

Without belaboring the point unduly, there is other sufficient evidence to support the rulings of the trial court and the conclusion of the jury that, in promulgating its handbook, Western States intended to make its employees' employment terminable only for cause. For example, we note that Western States' employment application form in 1980 stated: "I understand that my employment is for no definite period and may . . . be terminated at any time without previous notice." This "at will" language was removed from Western States' 1984 application form; and, instead of this language, the form merely stated that "any misleading or incorrect statements may render this application void, and if employed would be cause for termination." In addition to deleting the at-will language from its application form, Western States also changed its handbook to include detailed procedures related to discipline and dismissal of its employees. Under the terms of the amended handbook, disciplinary actions must take the following course: (1) oral reminder; (2) written reminder; (3) discharge. The handbook further provided that these procedures could be bypassed only if "the employee commits an offense so serious that immediate discharge without prior warning is appropriate."

On the total record, it appears that Judge McDaniel did not err in upholding the jury's finding of contractual liability in this case, because the changed language in the application form and the language contained in Western States' employee handbook could reasonably be interpreted to have changed the status of Western States' Jones and other employees from that of "at will" to "for cause."

Eight years ago, in Southwest Gas Corp. v. Ahmad, 99 Nev.

594, 668 P.2d 261 (1983), this court recognized that contractual obligations can be implicit in employer practices and policies and as reflected in employee handbooks.

The decision of prestigious courts in other jurisdictions support our holding in *Ahmad* and the other cases previously cited. For example, in the case of Foley v. Interactive Data Corp., 765 P.2d 373 (Cal. 1988), the California Supreme Court recognized that where no explicit agreement of continued employment is entered into, an agreement can be implied from the circumstances of the employment. *Foley* recognized that employees may be induced by employers to take employment or remain on the job by the conduct, policy and implied promises of the employer. Such employees may, accordingly, have enforceable rights which can be asserted in the courts. The *Foley* court observed that "[a] review of other jurisdictions also reveals a strong trend in favor of recognizing implied contract terms that modify the power of an employer to discharge an employee at will," and that this rule "is one that has achieved widespread acceptance in recent years." *Id.* at 384. The Michigan Supreme Court is in accord. *See* Toussaint v. Blue Cross & Blue Shield of Michigan, 292 N.W.2d 880 (Mich. 1980).

Jones's position is that he was at no time and in no manner insubordinate or unwilling to submit to his employer's authority. The jury agreed with him, and Judge McDaniel entered judgment on a jury's verdict in favor of Jones which was amply supported by the evidence. Jones admits that he expressed his unwillingness to work in the cyanide leach pit at a time when he was suffering from an unclosed surgical wound. He testified that this unwillingness was prompted by Western States's safety policies and by his own reluctance to place himself in a knowingly dangerous situation. The company, on the other hand, contends that Jones's unwillingness to accept the temporary cyanide assignment was outright insubordination and willful refusal to perform a lawful employment assignment required of him by his superiors. This pivotal factual issue was, of course, decided in favor of Jones by the jury which, by its verdict, necessarily concluded that Jones was not insubordinate and that he was, therefore, impermissibly discharged.

We now turn to a more detailed discussion of the facts surrounding the termination, facts which must be viewed in the light most favorable to Jones. *See K Mart,* 103 Nev. at 43, 732 P.2d at 1366.

Mine manager Rice defined the principal factual issue in this case at trial when he testified that "the issue here was Mr. Jones's refusal to work around cyanide." The evidence strongly leads to

the conclusion that there is nothing in Jones's conduct that even approaches an insubordinate refusal to work around cyanide. Jones's refusal—if it can be called that—was simply his telling immediate superiors that it was unsafe and contrary to company safety policy for him to work in the cyanide area while he had an open surgical wound. Jones had learned of cyanide absorption risk and the need to protect unhealed wounds from cyanide exposure when he attended one of Western States's required safety courses. It was made clear to him during this safety course that anyone with an open wound should avoid contact with cyanide because of the increased danger of cyanide absorption into the body. A witness for Western States testified that Jones was assigned to "work around cyanide" because "the heavy equipment which he usually operated broke down." For this reason Jones temporarily was sent to "lighter" duty in the company's cyanide leach pit. One company witness testified that, upon arrival at the cyanide area Jones very respectfully declined to work in the cyanide area and explained the reason for his refusal. There appears to be no question about the danger presented to Jones by the cyanide leach pit. Specific cautionary language on sodium cyanide is set out in the DuPont manual introduced into evidence by Jones, which states: "Never permit contact with open wounds or skin abrasions." Jones was clearly exercising appropriate safety precautions when he advised his superior at the cyanide leach pit that he should not and would not work in proximity to cyanide while suffering from an unclosed surgical wound.

After indicating his reluctance to work around cyanide, Jones went from the cyanide area to the company office where he offered himself for any temporary assignment which would not put him in the danger that he would be in at the cyanide leach pit. He was told to go home; but it was not suggested in any way that his job was in jeopardy. The next day he was called back to company headquarters and advised that he was being fired for insubordination.[9]

Apparently thinking that the mine manager, the final authority, would not persist in his decision to dismiss him if he knew the true facts about Jones's health and safety reasons for refusing cyanide duty, Jones obtained an explanatory statement from his physician. The doctor wrote that because Jones had "a healing wound in his lower abdomen . . . he should not be exposed to this substance due to the potential adverse effects this could have on wound healing." Neither the protestations of Jones nor his physi-

---

[9]Jones testified that if he had known he was going to lose his job for exercising this caution, he probably would have gone ahead and faced the danger by entering the cyanide leach pit.

cian's explanation influenced the mine manager to change his decision to terminate Jones, and Jones's employment was permanently terminated.

It is very difficult to understand how, under the handbook's disciplinary system, anyone connected with the company could even suggest that Jones was guilty of "an offense so serious that immediate discharge without prior warning is appropriate." It is very clear from all of the evidence that Jones's working in the cyanide area was not only a risk to him but was also a violation of company policy; but even if Jones were wrong in refusing temporary duty in the cyanide area, and even if the mine manager believed that he had the power to order Jones into the cyanide leach pit, there was no insubordination here. On the day of the incident when Jones declined, with appropriate explanation, to clean cyanide nozzles, there was no talk of insubordination, no threat of termination—he was simply sent home. What makes Jones's discharge even more perplexing is that, before the final discharge decision was made, management had time to review his personnel records and, more importantly, to verify the legitimacy of Jones's refusal to work in the cyanide area. The mine manager knew of the wound and had even seen the bandage on the wound. At trial the mine manager conceded that Jones had the right to refuse the assignment in the leach pit. At the very worst, Jones's unwillingness to go into the cyanide pit was a minor misunderstanding between Jones and his superior concerning the company's right to compel Jones to perform this duty. This is the kind of misunderstanding that could very well have been adjusted by the "written reminders" and other "steps" provided for in the company employee handbook.

We would be unwarranted in saying that Judge McDaniel erred in upholding the jury's conclusion that Jones was not insubordinate, that he had the right to refuse cyanide duty, and that in these circumstances the company violated its contractual obligation to Jones by discharging him without going through the measures prescribed by the company's disciplinary system. In accord with the judgment of the trial court, we think that there is ample evidence to support a jury finding that an employment contract existed, that Western States violated the contract and that Jones suffered contract damages from such breach. Thus, having concluded that the trial judge did not err in this regard, we go now to examine respondent's claim that tort liability exists because of breach of the implied covenant of good faith and fair dealing.

### *The Tort of Breach of the Implied Covenant of Good Faith and Fair Dealing (Bad Faith Tort)*

In K Mart Corp. v. Ponsock, 103 Nev. 39, 51, 732 P.2d 1364,

1372 (1987), we held that the covenant of good faith and fair dealing implied in an employment contract for indefinite future employment could, under certain limited circumstances, be the basis for tort liability in a manner comparable to the tort liability incurred by insurance companies when they deal in bad faith with their policyholders.

In *K Mart* we made it clear that "mere breach of an employment contract" does not of itself "give rise to tort damages" and that the kind of breach of duty that brings into play the bad faith tort arises only when there are "special relationships between the tort-victim and the tortfeasor . . . ." *K Mart,* 103 Nev. at 49, 732 P.2d at 1370.

Where the employer-employee relationship becomes analogous to or approximates the kind of "special reliance," trust and dependency that is present in insurance cases, we concluded in *K Mart* that betrayal of this kind of relationship may go "well beyond the bounds of ordinary liability for breach of contract" and may result in the offending party's being held tortiously liable for such perfidy. *Id.* at 48, 732 P.2d at 1370.

Although Jones relies most heavily on his claim for tortious discharge on Western States's violation of this state's public policy favoring safety in the workplace, he also asserts a right to recovery under a claim of tortious bad faith discharge. Preliminarily we note that the facts of this case are rather far removed from those in *K Mart* insofar as the relationship of the parties is concerned. In *K Mart,* the employee, Ponsock, had been a faithful employee for almost ten years with every expectation of continuing his employment for an indefinite period of time and at least until he became eligible for a retirement pension. Ponsock was hired "until retirement," and his contract of continued employment was not only terminated arbitrarily but by artifice and fraud. *Id.* at 42, 732 P.2d at 1366. The kind of relationship that existed between K Mart and Ponsock does not exist here; neither is there the kind of pretension, misrepresentation and betrayal that was the essence of bad faith tort liability in *K Mart.*

Jones's employment relationship with Western States presents a strong contrast to that of Ponsock and K Mart. Although Jones had been designated as a "permanent employee" at the time of his dismissal, he had worked less than two years. Ponsock, on the other hand, had been hired on a more permanent basis, that is, "until retirement," *id.* at 42, 732 P.2d at 1366, and, after almost ten years on the job, had no reason to suspect that he was going to be arbitrarily terminated, much less fraudulently deprived of his employment and retirement rights.

If we use *K Mart* as the exemplar for that narrow class of cases in which, because of the relationship of employer to employee, the offending conduct "goes well beyond the bounds of ordinary

liability for breach of contract," *id.* at 48, 732 P.2d at 1370, we can see why Jones does not fall within that class. Because the requisite relationship cannot have ripened under the facts of this case, and, more importantly, because the kind of deception and perfidy which was the essence of the bad faith tort in *K Mart* is not present here, we must reject any claim by Jones for tort damages based on breach of the implied covenant of good faith and fair dealing. Next we consider whether Jones has sustained a tort claim for tortious discharge.

### *Tortious Discharge: Public Policy Tort*

As pointed out in *K Mart,* 103 Nev. at 46, 732 P.2d at 1369, although "a public policy tort cannot ordinarily be committed absent the employer-employee relationship, the tort, the wrong itself, is not dependent upon or directly related to a contract of continued employment such as that existing in the present case." The "tortious discharge," in other words, stands by itself; and although it arises out of the employer-employee relationship, it is not dependent on a contract of continued employment between the parties. The essence of a tortious discharge is the wrongful, usually retaliatory, interruption of employment by means which are deemed to be contrary to the public policy of this state. The prototypical tortious discharge case is found in Hansen v. Harrah's, 100 Nev. 60, 675 P.2d 394 (1984), in which an employee claimed to have been discharged to penalize him because he had filed a worker's compensation claim. 100 Nev. at 62, 675 P.2d at 396. Comparable tortious discharges may arise when an employer dismisses an employee in retaliation for the employee's doing of acts which are consistent with or supportive of sound public policy and the common good.

If an action for tortious discharge is to lie in the case now before us, it must first be established that Western States has, in its discharge of Jones, violated the public policy of this state. We conclude that it is violative of public policy for an employer to dismiss an employee for refusing to work under conditions unreasonably dangerous to the employee.

The Nevada Occupational Safety and Health Act (NOSHA) states that "[t]he legislature finds that such safety and health in employment is a matter greatly affecting the public interest of this state." NRS 618.015(2). After reviewing provisions in the California Labor Code which are comparable to NOSHA, the California Court of Appeal had this to say about public policy and the

termination of employees because of their seeking a safe work place:

> It requires little analysis to perceive that the legislative purpose underlying these provisions would be substantially undermined if employers were permitted to discharge employees simply for protesting working conditions which they reasonably believe constitute a hazard to their own health or safety, or the health or safety of others. Achievement of the statutory objective—a safe and healthy working environment for all employees—requires that employees be free to call their employer's attention to such conditions, so that the employer can be made aware of their existence, and given opportunity to correct them if correction is needed. The public policy thus implicated extends beyond the question of fairness to the particular employee; it concerns protection of employees against retaliatory dismissal for conduct which, in light of the statutes, deserves to be encouraged, rather than inhibited. In that respect, the policy at stake is similar to that which informed the court's decision in *Petermann v. International Brotherhood of Teamsters* (1959) 174 Cal.App.2d 184 [344 P.2d 25], which held that the state's policy of encouraging truthful testimony before legislative bodies would be undermined if an employer could terminate an employee for refusing to commit perjury.

Hentzel v. Singer Co., 138 Cal.App.3d 290, 298 (1982).

NRS 618.375 requires that all employers adopt practices which insure safe employment and that employers do everything reasonably necessary to protect the lives, safety and health of their employees. NRS 618.385(1) expressly prohibits employers from requiring employees "to go or be in any . . . place of employment which is not safe and healthful," a prohibition which the jury certainly could have found to have been violated in this case. There can be no doubt but that the public policy of this state favors safe employment practices and the protection of the health and safety of workers on the job. NRS 618.015(2). This being the case, we hold that dismissal of an employee for seeking a safe and healthy working environment is contrary to the public policy of this state.

Concluding that Western States violated public policy when it dismissed Jones does not end the matter, however. In Sands Regent v. Valgardson, 105 Nev. 436, 439-40, 777 P.2d 898, 899-

900 (1989), we refused to recognize an action for tortious discharge even though the defendant had clearly violated Nevada's public policy against age discrimination.[10] We refused to recognize an independent tort action for violation of the public policy against age-discrimination because the plaintiffs in *Valgardson* had already recovered tort damages in sums of $69,010.00 and $125,560.00 under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, and under NRS 613.310 *et seq. Id.* at 439-40, 777 P.2d at 900. It would not have been fair to the defendant in *Valgardson* to have allowed an *additional* tort remedy under the common law *Hansen* type of tortious discharge.

It is quite obvious that the *Valgardson* plaintiffs were vindicating much more than a mere contractual right to lost earnings. The recovery in *Valgardson* of $125,000.00 for wrongful discharge was clearly a tort rather than a breach of contract recovery. This conclusion is supported by the recent case of Rickel v. C.I.R., 900 F.2d 655 (3rd Cir. 1990), a tax case in which the court held that damages in an Age Discrimination in Employment Act suit are not taxable because they are analogous to redress of a tort claim for personal injury, irrespective of non-personal components such as compensation for lost wages. The court stated:

> [T]he scope of [the ADEA] goes beyond the mere employer-employee context, protecting individuals from various forms of discrimination even if they are not yet in a contractual relationship . . . *[C]ourts in other jurisdictions . . . have characterized an action to redress discrimination in the workplace as a tort claim for personal injuries* whether the discrimination was based on race, sex, or age.
>
> Thus, focusing on the nature of the claim, we are convinced that *the taxpayer's discrimination suit under the ADEA was analogous to the assertion of a tort type claim to redress a personal injury* . . . . The taxpayer merely sought

---

[10]In *Valgardson*, while basing our decision to deny a tort remedy on the availability of a specific statutory remedy, we used some possibly misleading language when we said that we did not "perceive that our public policy against age discrimination is sufficiently strong and compelling to warrant another exception to the 'at-will' employment doctrine." *Id.* at 439-40, 777 P.2d at 900. Certainly we did not mean to intimate that this state's strong policy against age discrimination was not sufficiently strong to support remedial court action. Employment termination based on age-discrimination does allow for an appropriate statutory remedy, which is in a certain sense an exception to the at-will doctrine, a doctrine which in its purest form allows for termination of employment for any reason. It is not correct, then, to say that age-discrimination is not a legally redressable injury; it can only be said, as is said in the text, that no *additional* court-created remedies, comparable to the remedy created in *Hansen,* arise out of age-based wrongful discharge for which tort recovery is available by statute.

the remedies afforded by the statute as compensation for the personal injury he suffered as a result of the employer's act of discrimination; the requested remedies were not separate claims in themselves to redress the employer's breach of a contract. The non-personal consequences of the discrimination, the loss of wages, does not transform discrimination into a non-personal injury.

900 F.2d at 662-63 (emphasis added; citations omitted).

The dissent expresses the view that this case is indistinguishable from *Valgardson,* and that Jones's rights are sufficiently vindicated by the remedy provided in NRS Chapter 618. On the contrary, this case is quite clearly distinguishable from *Valgardson.* In *Valgardson,* the statutory remedies at issue allowed discrimination *victims* to bring suit and, as discussed above, recover *tort damages* for their injuries. Conversely, in the present case the statutory remedy simply provides for an action by the administrator of the division of occupational safety and health, and then only for reinstatement and past wages and not general damages.[11] The statutory remedy at issue here is far less comprehensive than the one in *Valgardson,* in which damages of a tort-like nature had been recovered by the plaintiffs.

---

[11]The dissent agrees that Jones had a "right not to be forced into an unsafe workplace." The only disagreement is how this right should be enforced. We note that the statutory remedy under NRS 618.445 is permissive and not mandatory. ("Any employee aggrieved by a violation of subsection 1 *may* file a complaint . . . .") That an employee *may* ask the administrator to intervene on his behalf and seek reinstatement and back-pay seems to be a very inadequate remedy for the misconduct involved in trying to force a worker into an unsafe place at the risk of being fired. This use of permissive language supports our conclusion that this legislative remedy was intended to be *supplemental* and not exclusive.

The dissent also acknowledges that Western States' conduct was "wrong," but then takes the position that Jones' exclusive redress is contained in the Nevada occupational safety and health statutes (NOSHA). For several reasons, this cannot be the case. NOSHA, by its very terms, applies only where:

the employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding or because of the exercise by the employee on behalf of himself or others of any right afforded by this chapter.

NRS 618.445(1). Thus, in order for this section to apply at all, some kind of action must have been instituted *under the statute.* Here, Jones filed a common law action, and hence, NRS 618.445 is inapplicable.

A further reason is that the legislature does not declare the remedy to be exclusive as it does in other instances. For example, in NRS 616.370(1), it is stated that worker's compensation remedies "shall be exclusive." The legislature's not making such a declaration here is an indication that the remedy was not intended to be exclusive.

It is in precisely such cases, *i.e.*, where no comprehensive statutory remedy exists, that courts have been willing to create public policy tort liability. *See* Wehr v. Burroughs Corp., 438 F.Supp. 1052, 1055 (E.D.Pa. 1977), *aff'd,* 619 F.2d 276 (3d Cir. 1980). Here, Jones had no comprehensive statutory or other tort remedy available to compensate him for the civil wrong committed against him by Western States. He was, therefore, entitled to pursue an action for tortious discharge against his employer.[12] For this reason, the judgment against Western States is affirmed.

### Punitive Damages

The overall impression one gets of this case is that mine manager Rice asserted his authority over Jones simply to "show him who was boss." There is no explanation of why, after he became thoroughly aware of the circumstances of Jones's refusal to go into the cyanide pit until his surgical wound closed, Rice still persisted in terminating Jones. Western States placed Jones in a terrible position: Jones knew that company policy and directives prohibited him from entering the cyanide area; yet his doing exactly the proper thing with respect to Western States's own

---

[12]Appellant has raised as an issue on this appeal that Jones's public policy tort action is preempted because all mine safety issues are governed by the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 801 *et seq.* (1982). The trial court rejected the claim of federal preemption in these terms:

> The plaintiff's cause of action states clearly that because of an unhealed surgical incision from a surgical operation that he was susceptible to cyanide poisoning at that particular time. That the Defendant's agents and employees were aware of the danger to the Plaintiff ROBERT C. JONES and still insisted that he work around cyanide. That he was justified in refusing to so work because of his particular physical condition at that time and place and therefore he was unlawfully discharged.
> Thus there is no allegation that the Defendant was violating either the Federal or State Mine Safety Codes by requiring employees to work under unsafe conditions.

We have examined carefully Western States's argument and authorities, particularly the case of Olguin v. Inspiration Consolidated Copper Co., 740 F.2d 1468 (9th Cir. 1984), and have concluded that the trial court was correct in ruling that Western States's abusive treatment of Jones is actionable under state law. Jones, unlike *Olguin,* has not attempted to use any federal law or redress procedures, nor has he alleged any violation of the Mine Safety and Health Act. Nevada's interest in giving a remedy for such tortious actions is a substantial one; and we agree with the trial court that federal preemption does not prevent Jones from pursuing his state remedy. *See* Echard v. Devine, 726 F.Supp. 1045, 1049 (N.D.W.Va. 1989) (holding that Federal Mine Safety and Health Act does not preempt common-law claims for tortious discharge; distinguishing *Olguin* where a state has a *strong* interest in mine safety).

safety policies resulted in his losing his job. In effect Western States fired Jones for complying with company policy.

The jury in this case awarded tort damages, general and punitive. Judge McDaniel instructed the jury that it could assess punitive damages against the employer in this case if it found "fraud, oppression or malice, express or implied." There is evidence to support a jury finding that Western States was guilty of the intentional public policy tort, tortious discharge.[13] There is evidence to support the conclusion that the charge of "insubordination" was a contrivance and a fraud. There is evidence to support malicious intent and oppressiveness on the part of Western States. Therefore, we may not disturb the trial court's determination that the punitive damage award will be upheld.

Although Jones is not entitled to recover on his claim for tort damages for breach of the implied covenant of good faith and fair dealing, he is entitled to recover contract damages on his claim for breach of the employment contract and to recover tort damages for tortious discharge. We do not perceive any error on the part of Judge McDaniel in his conduct of the trial of this case. The judgment of the trial court is, therefore, affirmed.

ROSE, J., concurs.

MOWBRAY, C. J., concurring:

I join in and agree with the majority opinion; however, I wish to address several of the charges made in the dissent.

### PRELIMINARY COMMENTS

The dissenting author quotes at length a series of rhetorical questions that I posed from the bench during the oral argument of D'Angelo v. Gardner, et al.[1] The questions were focused on the

---

[13]As indicated above, we find it unnecessary to the disposition of this appeal to consider the assignments of error relative to the tort of intentional infliction of emotional distress.

[1]One of the justices stated from the bench:

So we're here over twenty bucks . . . . But he [D'Angelo] had twelve years of service. That's twice the term that we have on this court, our terms are six—that's three times the terms of the President of the United States. That's three times the terms of the Governor across the street. Now, he may be a lot of things that I don't know about. But this is all I know about him. And, he is axed because of that. Now, this is what the record reflects to me. Now, he wants to go in to a jury trial and he tries to get a jury trial, but the judge says "no, I'm going to cut you off at the gate. You can't have your jury trial." What bothered me when I reviewed those facts was, is this the decent thing to do? Is this living by the Golden Rule, when a man has worked for twelve years, based upon what I know. Is he married, does he have children, does he have

inquiry: "Is this the decent thing to do?" I stand by those questions. It is the duty of this court to protect the interests of all who come before it, not just the privileged and the powerful. A court of law should not be blind to justice.[2]

The dissent also suggests that the majority condones theft. This suggestion is an insult both to the integrity of this court, and to the intelligence of the reader.[3]

## D'ANGELO v. GARDNER, ET. AL., DOCKET NO. 20452

The author of the dissent complains that the majority's ruling "strikes at the validity or decency of the at-will employment doctrine." I suggest that my colleague misapprehends the majority opinion.

The primary issue addressed by the majority is whether appellant D'Angelo presented sufficient evidence of an implied-in-fact contract to survive summary judgment. The majority properly concludes, based upon the facts detailed in the majority opinion, that the evidence can support a prima facie cause of action. Nothing in the majority opinion invalidates or "decrees" an end to the at-will presumption.

Since the at-will presumption remains intact, one must wonder at the apocalyptic predictions set forth in the dissent. These misplaced and fanciful fears reflect a tone of consternation that permeates the entire dissent. The dissenting author's dismay may well result from the majority's unwillingness to acquiesce in the dissenters' attempt to transform the at-will presumption into an at-will conclusion.[4]

---

house payments. Is this what "at will" means, that you can do this to employees? Are they a bag of oats?

. . . .

But this is how I see this case. For twenty dollars involved, twelve years of his life, he gets the ax.

[2]There is an unfortunate trend among modern courts to regard justice as the unspeakable "J-word." I, for one, reject the idea that justice is an irrelevant consideration for a court of law. It is well to remember that he who does justice will live in the presence of the Lord. Psalms 15:2-5.

[3]I am frankly quite concerned about the dissent's ready willingness to sully Mr. D'Angelo's reputation, and summarily treat him as a thief. "Dishonesty is dishonesty" exhorts the dissenting author. The whole point, of course, is that we do not know whether the man was a thief or an innocent victim. And the reason we do not know this is because Mr. D'Angelo has not yet had his day in court.

[4]The at-will presumption is indeed a presumption, not a conclusion. When employers make promises of continued employment to employees, those promises should be binding. *Employers have duties to employees just as employees have duties to employers. Their relationship is a two-way street.*

This state has long recognized implied-in-fact contracts in the employment context. In Southwest Gas Corp. v. Ahmad, 99 Nev. 594, 668 P.2d 261 (1983), this court concluded that an employer was contractually bound to honor a termination clause appearing in an employee handbook.[5] The *Ahmad* opinion has never been overruled, and it is controlling in the case before us.

Instead of adhering to our holding in *Ahmad,* the dissenting author glosses over that precedent in favor of those cases with which he agrees.[6] In particular, he relies upon *Valgardson*[7] and *Vancheri*[8]. Neither case supports the dissenting author's position.

In *Valgardson,* this court determined that "no provision in the handbook modified the Sands' common-law right to discharge [its employees] at its whim." *Valgardson,* 105 Nev. at 439, 777 P.2d at 899 (citing Smith v. Cladianos, 104 Nev. 67, 68-69, 752 P.2d 233, 234 (1988)). Unlike GEMCO's employee handbook, the Sands' handbook contained no language which might imply permanent employment. Thus, *Valgardson* is distinguishable from the instant case.

The dissent's reliance on *Vancheri* is equally misplaced. In *Vancheri,* a breach of contract action was tried before the jury. *Vancheri,* 105 Nev. at 419, 777 P.2d at 368. At trial, Vancheri failed to introduce any independent evidence of an express or implied contract other than his "understanding" of the arrangement. *Id.* at 421, 777 P.2d at 369. At the close of the case-in-chief, the district court dismissed the action pursuant to NRCP 41(b). *Id.* at 419-420, 777 P.2d at 368. We affirmed the judgment, concluding that "[c]ontracts of employment cannot be created by the subjective expectations of an employee." *Id.* at 421, 777 P.2d at 369. In the case before us, however, Mr. D'Angelo presents much more than "subjective expectations." As the majority opinion makes clear, the language included in the employee handbook, together with GEMCO's use of the handbook as the basis for D'Angelo's dismissal, raises an inference of an obligation of continued employment.

Thus, notwithstanding the best efforts of the dissent, existing case law cannot support a summary judgment in the present case. Perhaps when the clouds of dogma clear, and the opinion is viewed "in the clear light of day," the dissent will perceive its error.

---

[5]For a complete discussion of *Ahmad,* I refer the reader to the majority opinion, pp. 3-4.

[6]Perhaps because he dissented in *Ahmad,* the dissenting author concludes that he can unilaterally disregard the precedent set forth in that case.

[7]Sands Regent v. Valgardson, 105 Nev. 436, 777 P.2d 898 (1989).

[8]Vancheri v. GNLV Corp., 105 Nev. 417, 777 P.2d 366 (1989).

Accordingly, I concur in the majority's decision to reverse Judge Thompson's order granting summary judgment and to remand this case to the district court for a trial on the merits.

### WESTERN STATES MINERALS CORP. v. JONES, DOCKET NO. 19697

This is one of the most egregious cases ever to come before this court. Mr. Jones was ordered by his supervisors to work around cyanide while suffering from an open surgical wound. Mr. Jones had learned from company training sessions that this would be dangerous. He informed his supervisors that it would be unsafe to work around the cyanide area while he still had the open wound. Mr. Jones was fired for this "insubordination."

Nevada recognizes a claim of tortious discharge in violation of public policy. *See* Hansen v. Harrah's, 100 Nev. 60, 675 P.2d 394 (1984). The discharge of Mr. Jones violated public policy. Why then, does the dissent conclude that no cause of action lies?

To answer this question, it is helpful to consider the following statements made by the dissenting author during oral argument of this case:

> I don't think there's any division at all on this court, there's no need for emotion, this man was wrongfully treated
> . . . .
> Every member of this court, in the original opinion that was recalled, agreed that this man was wrongfully treated— so there's not an issue there. There are, however, legal issues. And, unfortunately, this court has to deal with legal issues. That's all I wanted to say.

On the surface, the rationale advanced by the dissenting author seems almost beyond reproach. "There's nothing we can do about it" is the outcry; "We are constrained by the law." A closer look at the dissent exposes more insidious motives.

As the "legal issue" that bars a cause of action, the dissenting author cites NRS 618.445(2), which provides as follows:

> Any employee aggrieved by a violation of subsection 1 may file a complaint for the relief afforded under subsection 3, after first notifying his employer and the division of his intention to file the complaint. Any complaint must be filed with the division within 30 days after the violation has occurred and must set forth in writing the facts constituting the violation.

This statutory provision is irrelevant to the instant case. Mr. Jones brought a common law action for wrongful discharge in violation of public policy; NRS 618.445(2) does not address or in

any way preclude that common law tort. Rather, that statute creates a right of reinstatement for workers who have been discharged for filing a complaint, testifying in a proceeding, or exercising a right afforded by NOSHA. *See* NRS 618.445(1).[9] Thus, no genuine legal issue precludes Mr. Jones from bringing this tort action.

The dissenting author claims that there is nothing we can do, given the existing legal parameters, to redress the wrongful treatment suffered by Mr. Jones. This claim is spurious. It is offered only to mask a desire to abridge the rights of employees to be free of arbitrary or unjust discharge.

Accordingly, I concur in the majority's decision to affirm the judgment of the district court.

## CONCLUSION

I, therefore, agree with the majority opinion in D'Angelo v. Gardner, et. al., reversing the summary judgment of Judge Thompson and remanding the case for a trial on the merits, thereby ensuring that Mr. D'Angelo shall have his day in court. I further agree with the majority that the jury verdict in Western States Minerals Corp. v. Jones be affirmed and that the award of damages to Mr. Jones be sustained.

STEFFEN, J., with whom YOUNG, J., joins in dissenting:

## PRELIMINARY COMMENT

Under Nevada Rules of Appellate Procedure, Rule 40(c)(2), petitions for rehearing are proper only: "(i) [w]hen it appears that the court has overlooked or misapprehended a material matter in the record or otherwise, or (ii) [i]n such other circumstances as will promote substantial justice." *See also* In re Petition to Recall Dunleavy, 104 Nev. 784, 769 P.2d 1271 (1988) (presence of conditions specified in NRAP 40(c)(2)(i) or (ii) essential to rehearing). The facts have not changed since we originally heard and reviewed these appeals. No member of the majority has concluded that the law announced in the first opinions which were recalled was in error, thus resulting in a miscarriage of justice. The reason for granting rehearing, with its attendant costs, thus remains a quandary.

---

[9]NRS 618.445(1), referred to by subsection (2) states the following:

> A person shall not discharge or in any manner discriminate against any employee because the employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding or because of the exercise by the employee on behalf of himself or others of any right afforded by this chapter.

## PRELIMINARY OVERVIEW

This dissent is neither an apologia nor a protagonism concerning at-will employment. It is a statement of what is (prior to the instant majority opinion), rather than a philosophical proposition of what ought to be. It is also hopefully a reminder of the need for stability and predictability in the law as well as a reaffirmation of the proposition that judges should be reluctant to "rush in" where legislators fear to tread. It is also begrudgingly written in light of the constraints and non-renewability of time and a recognition that dissents are usually fodder for "bonfires of the vanities," rarely read or heeded, and a source of congestion for consumers with increasingly limited storage space. Nevertheless, I am constrained to express my strong opposition to both the reasoning and the results of the majority opinion as a harbinger of things to come.

As noted in Southwest Gas Corp. v. Ahmad, 99 Nev. 594, 668 P.2d 261 (1983), "Nevada has not as yet seen fit to legislatively abrogate the common law rule concerning 'at-will' employment. This rule, which remains in general effect throughout the United States, provides that employment for an indefinite term may be terminated at any time for any reason or for no reason by either the employee or the employer without legal liability." *Id.* at 596, 668 P.2d at 262 (STEFFEN, J. dissenting).[1]

Fortunately, the evolution of the common law respecting the at-will doctrine has produced an ameliorative effect on the harshness of its pristine dictates. As of 1988, apparently a total of thirty-nine states had placed limitations of one form or another on the doctrine. Summers, *Labor Law as the Century Turns: A Changing of the Guard,* 67 Neb.L.Rev. 7, 14 (1988). In the cited article, Professor Summers also states:

> Although not all courts have recognized exceptions or limitations to the employment at will doctrine, courts in thirty-two states have adopted public policy exceptions, eleven states have applied the covenant of good faith and fair dealing, and twenty-nine states have used employee handbooks to find contractual limitations on terminations.

*Id.* at 13, 14.

Heretofore, this court has also responsibly advanced the common law doctrine concerning at-will employment by recognizing strong public policy exceptions, *e.g.,* Hansen v. Harrah's, 100 Nev. 60, 675 P.2d 394 (1984) (discharge in retaliation for filing workmen's compensation claim), and limitations resulting from

---

[1]During the 1991 legislative session, an effort to adopt legislation that would have eliminated at-will employment in Nevada did not survive consideration at the committee level.

express contracts evidenced in part by clear commitments in employee handbooks. American Bank Stationery v. Farmer, 106 Nev. 698, 799 P.2d 1100 (1990). When the smoke clears on today's opinion, and it is again seen in the clear light of day, it will be evident that, despite surface protestations to the contrary, the majority has come perilously close to taking the fallen baton from the legislature and decreeing an end to at-will employment.

## D'ANGELO v. GARDNER, ET AL., DOCKET NO. 20452

Although I do concur with the majority's conclusion that summary judgment was proper on D'Angelo's defamation claims, I otherwise strongly dissent from the remainder of the majority's opinion.[2]

I submit that the majority's reversal of the district court on the issue of wrongful discharge creates a quagmire in the law of wrongful discharge and at-will employment in the state of Nevada. Employment terminations in Nevada that implicate employee handbooks and some form of discipline procedure now provide at least, to borrow a phrase uniquely apropos to our state, a "roll of the dice" opportunity for imposing liability for wrongful discharge. Moreover, as I have stressed previously (Southwest Gas Corp. v. Ahmad, 99 Nev. 594, 668 P.2d 261 (1983) (STEFFEN, J. dissenting)), I do not view the majority position as being labor-friendly. A person need not be clairvoyant to predict employer reactions to such judicial incursions in traditional employer-employee rights and relationships. Employee manuals and discipline structures are frequently expressive of policies intended to benefit employees. As the decisional law now stands in Nevada, many employers will seek refuge from our rulings by eliminating or severely restricting the liability components fashioned by this court.[3]

---

[2]Presumably because this appeal arose from summary judgment against D'Angelo on all issues, no point was raised on appeal concerning a possible ERISA preemption resulting from the contention below that absent the termination, D'Angelo would have received a much larger pension after only one more year on the job. I therefore express no opinion as to whether this case may be subject to an ERISA preemption. See Marcoz v. Summa Corp., 106 Nev. 737, 801 P.2d 1346 (1990).

[3]The primary difference between the instant majority opinion and the original D'Angelo opinion that was recalled after the petition for rehearing was granted appears to be a footnote comment which was added to the current opinion. I have grave doubts that an employer "can easily prevent this inference [that a handook formed part of the employment contract of the parties] from arising" by incorporating specific disclaimers of implied contractual liability. Based upon the majority's current ruling, it seems that the gratuitous footnote will have little meaning in future cases where handbook references may be utilized to buttress contentions of reliance based upon a combination of factors, including a history of fairness in approaching

Although it is by no means clear from the record that GEM-CO's employee handbooks even applied to D'Angelo as a management level employee, I shall assume their applicability for purposes of this dissent. I suggest, however, that the handbooks supply no basis in law or fact for concluding that the employment relationship between GEMCO and D'Angelo was anything other than at-will.

Our recent decisions in Sands Regent v. Valgardson, 105 Nev. 436, 777 P.2d 898 (1989), and Vancheri v. GNLV Corp., 105 Nev. 417, 777 P.2d 366 (1989), should be dispositive of this appeal. In disregarding the obvious appositiveness of these two cases to the instant case, the majority has introduced confusion and unpredictability to Nevada's law on wrongful discharge and at-will employment.

In its analysis of *Valgardson,* the majority derives the proposition that "[t]he relationship of an employer and employee may be such that the employer does not have the right to discharge the employee without first abiding by conditions relating to dismissal which are either expressly agreed upon by the parties or *inferable from the dealings and practices of the parties.*" (Emphasis mine.) In *Valgardson* we did no more than recognize that there was no express contract between the complaining parties, Valgardson and Metzer, and Sands Regent that obligated the latter to provide continuing employment to the former. At no time in *Valgardson* did we declare or even hint that an "obligation of continued employment" existed by virtue of inferences derived from "the dealings and practices of the parties." *Valgardson* also emphasized that wrongful or bad faith discharge presupposes the existence of an employment agreement without which no cause of action exists.

Moreover, a basis for relief under a wrongful discharge theory was far more compelling in *Valgardson* than in the instant case. In *Valgardson,* however, we not only concluded that a termination based upon age discrimination (statutorily prohibited in Nevada) did not constitute an exception to the at-will employment doctrine, but we also held that an employee handbook containing a provision analyzed by this court in Smith v. Cladianos, 104 Nev. 67, 752 P.2d 233 (1988), did not modify "the Sands' common law right to discharge [its employees] at its whim."

employee terminations. In any event, it is clear from the facile panacea suggested by the majority that an employer in Nevada is no longer free to express company policies in effect at any given time without express statements of reminder to employees that the handbook confers no rights, express or implied, and that employees may expect to be terminated at any time, with or without cause. If this is a positive development in the area of labor-management relations, I fail to see it.

*Valgardson,* 105 Nev. at 439, 777 P.2d at 899 (quoting *Cladianos,* 104 Nev. at 68-69, 752 P.2d at 234).

Importantly, the Sands Regent handbook considered in both *Cladianos* and *Valgardson* contained a provision establishing a 90-day probationary period for all employees during which a supervisor could terminate an employee's services "without prior notice." *Cladianos,* 104 Nev. at 68, n.3, 752 P.2d at 234. This court refrained from concluding that by inference, terminations occurring after the probationary period required prior notice or that the provision inferred some entitlement to "continued employment."

By contrast, the handbook in the instant case does mention "proper cause" under the "Work Rules" section of the one handbook, and "primary reasons" considered as grounds for discharge in the "Discharge" section of the other handbook.[4] Thus, the majority, after noting that D'Angelo was required to read the handbook at the time of his hiring, observes that the handbook addresses the subject of discharge, and "in addition to referring to 'proper cause' for dismissal, sets out in some detail the 'primary reasons which are considered by GEMCO as *grounds for discharge.'"*[5] The "proper cause" reference in the other handbook under the "Work Rules" section refers to "a few general rules" considered by the company to be serious and a proper cause for discharge.[6]

---

[4] The majority opinion confusingly relies upon two handbooks as if, in combination, they constituted a single, applicable document. Because I do not believe the handbooks support the majority position either singly or in tandem, I have addressed them both. However, during the hearing below, and a colloquy between counsel and the court, the district court judge ruled that the most recent handbook (exhibit 17) superseded the earlier handbook (exhibit 16). D'Angelo's counsel voiced no objection to the ruling.

[5] The entire paragraph under the handbook section entitled "Discharge" reads as follows:

> Unfortunately, it occasionally becomes necessary to discharge an employee. So that you may be aware of the primary reasons which are considered by Gemco as grounds for discharge, they are listed here
> . . . .

The provision then lists sixteen specific reasons which presumably reflect conduct that is viewed most seriously by the employer.

[6] The complete paragraph including the quoted language reads as follows:

> Listed here are a few general rules applicable throughout the Company. These are all obvious and necessary for the conduct of any business. Deviations from these rules are always considered most seious [sic] and are deemed by the Company to be proper cause for discharge . . . .

The referenced provision then proceeds to specify twenty-one work rules and then concludes with the general statement that "[t]here are many other

The record reflects that D'Angelo received no commitments or promises regarding length or security of his employment when he was hired. The only foundation upon which the majority's ruling may be fashioned is the contents of the two handbooks. In that regard, the majority points to the fact that GEMCO informed the labor commissioner that D'Angelo had been terminated for proper cause resulting from the violation of work rule number 6, as a basis for concluding that a trier of fact could find an express or implied contract of continued employment terminable only for cause. Disregarded entirely is the elementary principle that at-will employment relationships may be terminated for any *cause* (proper or otherwise) or no cause at all. It should hardly be surprising that most at-will terminations will occur for some articulable cause. The inescapable conclusion to be reached from the majority's logic is that employers who desire to maintain an at-will work force should never specify reasons for discharging employees. Another lesson to be learned from the majority's logic is that employers, if they want to risk the liability hazards of an employees' handbook, should never enlighten employees as to the primary reasons for employee terminations if they intend to maintain an at-will relationship with their employees. Finally, under the majority's logic and ruling, employers should realize that whenever they provide employee handbooks encompassing discipline policies and references to "cause" or "proper cause" every termination, if challenged, will present a triable issue as to whether there was an express or implied contract for continued employment.

Selectively choosing excerpts from the two handbooks, the majority notes in general that procedures for discharge are provided and that " '*any* discharge based on an employee's failure to perform work as required' must be 'preceded by written notice to the employee' " (quoting with unwarranted paraphrase from the last, unnumbered paragraph under the "Discharge" section of one of the handbooks).[7] I suggest that the majority has misinterpreted the thrust of the quoted language. It appears to me that the company sought to enlighten employees concerning primary rea-

---

procedures which apply to your job." In the "Gemco/Memco Welcomes You" section at the beginning of this handbook, it states:

> This handbook is not for general publication, but is the property of the Company. It is given to you for your information and to aid you in understanding our way of doing business and what is expected of you as a member of the GEMCO/MEMCO team.

[7]The complete paragraph paraphrased in part by the majority reads as follows:

> Except during the initial trial period, any discharge based on an employee's failure to perform work as required, will have been preceded by a written notice to the employee, clearly setting forth deficiencies in work performance.

sons for discharge including, for example, dishonesty, falsification of records, use of alcohol and drugs, etc., that would clearly result in a termination. The concluding reference in the unnumbered paragraph quoted by the majority refers to "any discharge *based on an employee's failure to perform work as required,* will have been preceded by a written notice to the employee, clearly setting forth deficiencies in work performance." (Emphasis added.) If the referenced language simply referred to *all discharges* as concluded by the majority, the qualifying language following the reference to "discharge" would be totally redundant. In my opinion, the company was simply stating, as a matter of policy, that when an employee's work is deficient, any termination will have been preceded by a notice. A "failure" to perform is far removed from a willful violation of an implied commitment to be honest and law abiding. If an employee steals or uses drugs on the job, most employers would likely terminate the employment relationship without prior notice. On the other hand, it reflects good business sense to notify honorable employees of performance deficiencies in order to provide a basis for improvement and retention. I suggest that this was both the import and basic thrust of the handbook language quoted by the majority.

I have dwelled at some length on the handbook language because the majority has parsed the contents of both the current and the obsolete handbooks to create a patchwork of terms upon which to base a construct for an implied agreement of continued employment.[8] Such a construct derives entirely from the provisions of policy handbooks taken out of context, which reflects no bargaining between the parties and no representations or suggestions concerning contractual rights of continued employment.

---

[8]In my previous dissent to the first D'Angleo opinion issued by this court, I addressed the majority's conclusion that GEMCO was required to provide some form of "fair adjudication procedure" in its termination process. Unfortunately, the majority opinion was thereafter modified and filed without my knowledge or that of Justice YOUNG, who joined in the dissent. My references to the majority's requirement that "some kind of fair adjudication" procedure be engrafted on the employee's handbook were, therefore, no longer referable to language contained within the majority opinion. I nevertheless refer to the position earlier taken by the author of both majority opinions and thereafter abandoned, because the complete absence of any form of structured discipline or adjudicative procedures in either of the GEMCO handbooks leaves a major void in the majority's logic concerning the sufficiency of the handbooks in forming the basis for an implied contract for continuing employment. By implication, the majority continues to impose on GEMCO some form of adjudicative requirement that would provide an internal basis for determining "proper cause," despite GEMCO's statement in the handbook that deviations from 21 listed rules would be *deemed* (a term descriptive of a "given" as opposed to a point of controversy or adjudication) "proper cause" for discharge.

Indeed, as previously noted, neither handbook provides any procedure whatsoever for terminating an employee. What principle, therefore, must the jury embrace at trial upon which to judge the propriety of GEMCO's procedure in terminating D'Angelo? Will the majority authorize a jury instruction consonant with its earlier pronouncement that GEMCO was required to have some form of fair adjudicative procedure written into its handbook? Or perhaps the unexpressed principle to be gleaned from the majority's ruling is that whenever a handbook mentions such talismanic terms as "proper cause" or "primary reasons" for discharge without providing any procedure for imposing discipline, including termination, a court or jury will be the arbiter for determining whether an employee may be discharged. The majority seeks to distinguish *Vancheri* on the basis that the instant case involves a handbook containing disciplinary procedures and mention of the words "proper cause," whereas the handbook in *Vancheri* had neither. I do not find the majority's reasoning persuasive. It was uncontroverted in *Vancheri* that GNLV had an *established* disciplinary system of procedures employed prior to termination.[9] Moreover, in *Vancheri* this court unanimously observed that:

> Standardized disciplinary procedures are generally positive additions to a business. They provide employers a method of cautioning employees, and afford employees an opportunity to improve job performance in order to retain employment. They also create a general consistency and security in the work place. *If we were to hold that the establishment of standard disciplinary procedures for employees is, in and of itself, sufficient to convert an at-will employee to an employee who can be fired only for cause, employers would be reluctant to continue to establish them.*

*Vancheri,* 105 Nev. at 422, 777 P.2d at 369-70 (emphasis added).

---

[9] The uncontroverted evidence in *Vancheri* revealed an established multi-stepped disciplinary procedure used by GNLV prior to discharging its employees. The steps included a verbal warning, a written warning, a second written warning, and a two-week suspension from work prior to the ultimate step of termination. *See Vancheri,* 105 Nev. at 419, 777 P.2d at 367-68. Although these procedures were not incorporated in the employees' handbook, they were firmly established disciplinary procedures as evidenced by uncontradicted testimony and documentary evidence adduced at trial.

By contrast, and notwithstanding the majority's repetitive reference to disciplinary procedures in the instant case, the *only* "procedure" set forth in either of the handbooks is the reference to the written notice of deficiencies provided to employees prior to termination. Even if it were assumed, as the majority does, that the referenced provision applied to all terminations, at no place in the handbook does it state or infer that the notice must be acted upon in any way prior to discharging an employee. There is no machinery for any type of review, hearing or pre-termination period of correction prior to the employer's right of termination in the handbooks involved in the instant case.

Another reason why, in my view, the case for wrongful discharge in *Vancheri* was much stronger than D'Angelo's is that Vancheri was induced by GNLV to leave secure employment with twice the salary under circumstances that included representations that "he would have a long and successful association with the GNLV family." *Id.* at 419, 777 P.2d at 367. And yet, despite the fact that Vancheri was denied the established disciplinary procedures prior to his discharge, and was given solid indications of long-term employment when he was induced to leave his existing place of employment, we held that "[b]ased upon the law and policy considerations, we hold that general expressions of job longevity and advancement, and the established disciplinary procedure as described in this case, are not, as a matter of law, sufficient to establish a prima facie case rebutting the at-will employment presumption." *Id.* at 422, 777 P.2d at 370. D'Angelo, on the other hand, was neither induced to leave other employment to join GEMCO nor received assurances and representations of secure, long-term employment at the time of his hiring. There were essentially no discharge procedures established in the GEMCO handbooks, another factor to be contrasted with the detailed, well established pre-termination procedures established at GNLV. Finally, in *Vancheri* we observed that Vancheri testified that "it was his 'understanding' that the employment was for a fixed period," but that he failed to "offer any independent evidence indicating the terms of an employment contract," and he "was never told that his employment would be terminated only for cause or that he would have employment for life or a specified period of time." *Id.* at 421-22, 777 P.2d at 369. We quite properly concluded that "[c]ontracts of employment cannot be created by the subjective expectations of an employee." *Id.* at 421, 777 P.2d at 369. As I have previously observed at length, there are far more compelling reasons why we should sustain the district court's ruling here than in *Vancheri*.

I again suggest that the majority's disregard of the clear doctrine recently announced by this court in *Vancheri* introduces nothing but uncertainty and confusion in the area of wrongful discharge and at-will employment. Moreover, the majority undermines this court's unanimous declaration in *Vancheri* concerning the importance of permitting employers to develop sound disciplinary procedures to caution employees, afford employees an opportunity to improve, and create a general consistency and security in the work place. Finally, in *Vancheri* we recognized the hazard to employees that would likely result in the form of employer reaction to any ruling that would suggest that the establishment of standard disciplinary procedures would, in and of itself, transmute at-will employment to employment terminable only for cause. Because the instant ruling presents nothing

more than a judicial connection of disjointed handbook terms relating to unstructured statements concerning discipline or discharge, the majority has thoroughly undermined this court's responsible expression of support for standardized discipline policies.

The extreme position taken by the majority in the instant case is also revealed by comparing it to this court's recent, unanimous ruling in American Bank Stationery v. Farmer, 106 Nev. 698, 799 P.2d 1100 (1990). In *Farmer,* this court discerned the presence of substantial evidence of an express promise that if Farmer accepted the proffered employment, he would be subject to termination only for cause. That evidence was buttressed by a bilateral review of the employee handbook at the time of Farmer's hiring, which unequivocally stated that an employee could be terminated only for cause. The *Farmer* court nevertheless stated:

> We emphasize that this opinion does not stand for the proposition that an employee handbook explaining a company's policies regarding termination automatically transforms an at-will employee into an employee who may only be fired for cause. Such a holding could discourage companies from publishing such handbooks. This case is distinguishable from Smith v. Cladianos, 104 Nev. 68, 752 P.2d 233 (1988), in which this court held that a provision in an employee handbook did not modify an employer's ability to discharge an at-will employee. In the instant case, ABS's handbook is *written* evidence of an express *oral* contract between ABS and Farmer that ABS would only fire Farmer for cause.

> We further stress that we have decided this case on contractual principles only and have not modified the presumption that all employees are at-will employees.

*Id.* at 763, 799 P.2d at 1102. (emphasis in text).

Despite the language in *Farmer* "stressing" and "emphasizing" that employee handbook provisions regarding termination do not automatically transmute at-will employment into "for cause" employment, and that Farmer prevailed because of an express contract negativing a right to terminate for reasons other than cause, the majority today emasculates, disregards, and otherwise totally relegates the *Farmer* crescendo into inconsequential verbiage. Here, there is not even a pretense of an express agreement for employment subject to termination only for cause. Nor is there any handbook language that would infer, imply or even hint that D'Angelo had an expectancy for continued employment terminable only for cause. Finally, there is no evidence of any bargaining between the parties that might serve as the basis for finding an implied contract, let alone an express contract, for continued employment subject to discharge only for cause.

Before "rightfully terminating" this lengthy dissent, it is necessary to grapple with an added nuance that developed during argument on rehearing. Because this is an appeal from summary judgment, attention must be given to the present posture of D'Angelo's case as it is remanded for trial on the merits.

First, as far as the law of the case is discernible, the trial below will proceed on the basis that a jury may conclude that both GEMCO and D'Angelo intended to be bound by the terms of the handbook, and that as a result, an inference may arise that there was an "obligation of continued employment" for the following reasons: (1) at the time of D'Angelo's hiring, and as a condition of employment, he was required to read and acknowledge his understanding of the employee handbook; (2) the handbook (it apparently doesn't matter whether it is the obsolete handbook or the current handbook, as the majority has relied on both) deals with the subject of discharge; (3) the handbook makes reference to "proper cause" for dismissal; (4) the handbook "sets out in some detail the 'primary reasons which are considered by GEMCO as *grounds for discharge;*'" and (5) "*any* discharge based on an employee's failure to perform work as required" must be "preceded by written notice to the employee."

Also, the majority determined inferentially that GEMCO's termination of D'Angelo was arguably faulty, and therefore subject to resolution by a jury, because (1) taking the word of two employees who said they had personal knowledge that D'Angelo had discounted current film was insufficient as a matter of law to justify termination, or (2) the "petty incident" [of discounting current film] was an inadequate basis to justify termination under a proper cause standard. I find both conclusions equally troubling. Based upon a few disjointed, equivocal handbook provisions, the majority has now determined that any determination by GEMCO to terminate an employee is contestable before a jury as the final arbiter of "proper cause."

The majority has also concluded that a willful violation of a company policy that results in the unauthorized gift of twenty dollars worth of company property to a friend of an employee is "petty." This aspect of the majority's conclusion was emphasized during argument at rehearing. One of the justices stated from the bench:

So we're here over twenty bucks. . . . But he [D'Angelo] had twelve years of service. That's twice the term that we have on this court, our terms are six—that's three times the terms of the President of the United States. That's three times the terms of the Governor across the street. Now, he may be a lot of things that I don't know about. But this is all I know about him. And, he is axed because of that. Now,

this is what the record reflects to me. Now, he wants to go in to a jury trial and he tries to get a jury trial, but the judge says "no, I'm going to cut you off at the gate. You can't have your jury trial." What bothered me when I reviewed those facts was, is this the decent thing to do? Is this living by the Golden Rule, when a man has worked for twelve years, based upon what I know. Is he married, does he have children, does he have house payments? Is this what "at will" means, that you can do this to employees? Are they a bag of oats?

. . . .

But this is how I see this case. For twenty dollars involved, twelve years of his life, he gets the ax.[10]

I quote the above comments from the bench, along with the majority's characterization of the incident as "petty" because I believe it explains, where the legal reasoning cannot, the true basis for the majority's ruling.[11] I am also fearful, absent discus-

---

[10]Unfortunately, these comments were widely reported in the press, thus posing an additional problem as far as a fair trial is concerned. At no point during rehearing was there an attempt to discuss what measures GEMCO had taken prior to discharging D'Angelo. Despite the fact that two GEMCO employees, including a trained security agent, claimed to overhear D'Angelo agree to sell current, unexpired film priced at $3.97 per roll to his friend for "two bucks a pop," GEMCO thoroughly investigated the incident, even to the point of having the two allegedly percipient employees undergo polygraph examinations. The polygraph examiner stated by deposition that she concluded that the two employees were being truthful.

Although I am strongly of the opinion that D'Angelo was an at-will employee, the record reflects a substantial effort by GEMCO to explore all aspects of the incident, in addition to D'Angelo's prior record in adhering to company policy, before it finally decided to terminate him. I see no evidence that he was treated like a "bag of oats" or that the termination procedure was inadequate or unfair even under a "for cause" standard. It nevertheless appears from the stance taken by the majority that the legal standard by which GEMCO's conduct will be measured will not simply be whether there was cause to terminate D'Angelo, but whether it was fair to terminate this twelve-year employee over a dishonest discount amounting to the "petty sum" of only twenty dollars. I fail to see how this court's ruling can introduce anything other than chaos in the area of employment law in this state. I stress again that we will have paved the way for a substantial negative impact on Nevada's employees.

[11]The majority's characterization of the issue that prompted D'Angelo's discharge as "petty" is extremely troubling where GEMCO specified in its handbook that extending unauthorized discounts to anyone was most serious and "deemed by the Company to be proper cause for discharge." The majority not only seeks to superimpose its own views of morality and fairness on GEMCO's right to determine what constitutes serious employee misconduct, it also presumes to subject GEMCO's termination decisions for violation of its rules to a jury's scrutiny to validate the accuracy of the company's findings. Thus, as GEMCO proceeds to trial under the legal

sion by way of this dissent, that a combination of the majority's assignation of pettiness to the unauthorized discounts and the quoted comments from the bench will be prequel to plaintiff's summation at trial.

Although I am not without sympathy for the argument that twelve years of presumably faithful service should be of greater value than a twenty-dollar mistake, the other side of the coin must also be considered. First, dishonesty is dishonesty. Whether it is twenty dollars, twenty cents or hundreds or thousands of dollars, the principle is honesty, not "twenty bucks." Surely any court could take judicial notice of the enormous losses sustained by employers, and ultimately consumers, because of employee theft or defalcation. Moreover, if this court is to announce its condonation of twenty-dollar defalcations by employees, at what point would our judicial officers conclude that the matter is sufficiently serious to permit termination by an aggrieved employer without first having to endure vindication by a jury? A hundred dollars? Five hundred dollars? Perhaps a thousand dollars? When may an employer fall within judicial notions of "decency" for terminating an employee for acts of dishonesty? Perhaps if the employee is single or unburdened by house payments an employer may have more latitude in terminating for dishonesty. Despite whatever position one may take concerning the fairness of GEMCO's treatment of D'Angelo, if this court were to accord proper respect for the law as it is, the foregoing considerations would have no relevance. In any event, I would object most strenuously to any argument at trial that would parallel the characterization of the majority or other members of this court concerning the fairness or decency surrounding D'Angelo's termination. If, under the type of thread-bare basis for liability exemplified by this case, an employer's perceptions of proper cause for termination are to be validated by juries or this court, I shudder to contemplate the measures that will be taken by employers to insulate themselves from such extraneous and costly intrusions on employer-employee relationships.

It is apparent to me that the real thrust of the majority's ruling strikes at the validity or decency of the at-will employment doctrine. The majority opinion virtually paves the way for a challenge to all forms of termination in Nevada based upon

pronouncements and characterizations of the majority opinion, it must not only prove that its conclusion that D'Angelo had extended an unauthorized discount to a friend was true, it must also convince the jury that despite the majority's pronouncements and comments to the contrary, the discharge for violation of its rule was not petty, indecent or unfair. To suggest that GEMCO's prospects for a fair trial have been prejudiced by the majority is, it seems to me, a gross understatement. Equally irrational, I suggest, is the conclusion that legal precedent and the record in this case justify a trial on the merits.

"conditions relating to dismissal which are . . . inferable from the dealings and practices of the parties." Employers who provide an "atmosphere of job security and fair treatment," who specify reasons for discharging employees or who establish an expectancy of fair disciplinary treatment, including, but not limited to, pre-termination disciplinary procedures, are especially vulnerable under the majority's ruling to a legal challenge on every discharge. It doesn't take a genius to realize that the best way for employers to counteract the effect of the majority's pronouncements would be to establish an atmosphere of job insecurity and arbitrary, unstructured employee discipline including terminations without explanation. Fortunately, most employers would find such policies repugnant and a throwback to times when our laboring classes were exploited and subjected to all kinds of demoralizing demands and conditions. It nevertheless seems clear that employers will seek some form of relief from the majority's invitation to make the right to discharge any employee a subject for resolution by a judge or jury in a court of law. I suggest that vigorous legislative debate, deliberation and remedial legislation may be necessary in order to stabilize and render predictable what has now become a hopelessly confused and unstable area of law and social policy. After today, the most that can be said concerning the vitality of the at-will doctrine in Nevada is that it teeters on the slender and unpredictable ad hoc ministrations of this court after employers and employees suffer the expense and travails of trial.

## WESTERN STATES MINERALS CORP. v. JONES, DOCKET NO. 19697

Although I dissent from the majority's encore upon rehearing, I am of the opinion that the respondent, Robert C. Jones, had a valid claim against the appellant, Western States Minerals Corporation (Western States), based upon statute. Because I am convinced that Jones did not have valid claims for either breach of contract for continued employment or tortious discharge, I am unable to endorse either the reasoning or the result of the majority opinion.

Since the majority concluded that Jones had no cause of action based upon a bad faith discharge tort, a determination with which I fully agree, I shall devote no attention to that issue, although I concur only in the result of the majority's analysis on the subject.

## BREACH OF EMPLOYMENT CONTRACT

The majority determined that the evidence of record supplies a legal and factual basis for concluding that Jones enjoyed a contractual right to "continued employment" with Western States. I

do not agree. Although it is an elementary principle of contract law that competent contracting parties generally may agree to any terms or conditions that are lawful, I do not find in the record evidence of any contract of employment other than one terminable at will by either party.

In the first opinion issued by the majority and thereafter recalled after a rehearing was granted, the majority provided little detail concerning the Western States handbook and why it provided a basis for rebutting the presumption of at-will employment. The second time around, the majority supplies a footnoted analysis of the handbook in conjunction with its conclusion that "[t]here can be little doubt that, in promulgating the handbook, Western States intended to make its employees terminable only for cause." I find both the conclusion and the analysis unpersuasive. First, the majority resorts to the "at-will" language of a discontinued *employment application,* which confers no rights and constitutes no offer or promise of employment, as a basis for concluding, because of the omission to include such language in a subsequent *employment application,* that at-will employment was abandoned by Western States. The conclusion is supposedly buttressed by what the majority describes as supplanting language stating that "any misleading or incorrect statements may render this application void, and if employed, would be *cause* for termination." (Majority's emphasis.) The simplistic syllogism thus presented by the majority is that since the earlier "at-will" language in the employment application was removed and replaced with language containing the word "cause," Western States undoubtedly intended to make its employees terminable only for cause.[12] The reasoning is flawed.

The employment application was neither an offer nor an acceptance of employment. It was merely an informational document designed for use by Western States in determining whether to hire the subject of the application. There is no evidence that any conversation occurred between Jones and Western States concerning the change in language, let alone any intention on the part of Western States to extend Jones an offer of employment terminable only for cause. Moreover, it should be remembered that the at-will presumption refers to employment that may be terminated for any *cause* or no *cause.* Therefore, to conclude that the presumption is rebutted by reference to the word "cause" in connection with any disfavored conduct is hardly evidence of an intent to change a company's employment policy. The majority

[12]It apparently has never occured to the majority that if Western States had intended to change its employment policy from that of at will to employment terminable only for cause, it would have simply and unambiguously said so in its handbook.

nevertheless concludes that the reason for the change in the language is that Western States had, during the intervening period between the two application forms, promulgated an employee handbook containing "detailed procedures that *were required to be followed before an employee could be terminated.*" (Emphasis mine.) With an equal degree of disingenuousness, the majority then states, that "[b]y instituting these procedures, Western States created, as stated in the handbook, 'the kind of security everyone wants.'" The latter reference constitutes an inexcusable perversion of the quoted language of the handbook. The referenced phrase, in full context, appears in the handbook as follows: "The company benefit package—encompassing health, life and disability insurance, a pension plan, vacation and holiday time— has been put together over a number of years. It provides the *kind of security everyone wants, but which many families often can't afford on their own.*" (Emphasis added.) It is thus seen that the referenced phrase has nothing to do with any discipline procedures. As I will endeavor to show in the detailed discussion of the handbook that follows, the majority is equally misleading when it declares that the handbook provides detailed procedures that must be followed prior to any termination.

It is illuminating to focus on the handbook in the course of analyzing the majority's attempt to paint the instant case with the same brush used by this court in our recent case of American Bank Stationery v. Farmer, 106 Nev. 698, 799 P.2d 1100 (1990). In *Farmer* this court first reaffirmed "that all employees in Nevada are presumed to be at-will employees" and that "[a]n employee may rebut this presumption by proving by a preponderance of the evidence that there was an express or implied contract between his employer and himself that his employer would fire him only for cause." *Id.* at 701, 799 P.2d at 1101-02. The *Farmer* opinion then noted that there was an evidentiary basis for concluding that Farmer was given a specific offer for employment terminable only for cause, buttressed by the unequivocal declaration in the employee's handbook that an employee could be terminated *only for cause.* Finally, in *Farmer,* the court emphasized that "this opinion does not stand for the proposition that an employee handbook explaining a company's policies regarding termination automatically transforms an at-will employee into an employee who may only be fired for cause. Such a holding could discourage companies from publishing such handbooks." *Id.* at 763, 799 P.2d at 1102.

In the instant case, the majority's determination that a binding contract for continued employment existed between the parties is based in substantial part upon the simplistic conclusion that Jones agreed to abide by the terms of the employee handbook upon

which he had a right to rely.[13] Suffice it to say here that the Western States handbook contains no provision similar to the handbook in *Farmer* that specifies that an employee may be terminated only for cause. Nor is there evidence here, as there was in *Farmer,* that Jones was given any form of specific offer of employment terminable only for cause. The majority nevertheless concludes that because Jones agreed to abide by the terms of the employee's handbook, and that there was testimony indicating that Jones had a right to rely on the handbook provisions, an express contract of continued employment was formed. Even if the majority's premise had validity, there is no basis in the handbook for determining that Jones was given a contract for continued employment terminable only for cause.

In *Farmer* this court again recognized that employment agreements, like any other, are based upon contractual principles. A fundamental principle of contract law is that contracts are created by mutual assent. The record here reflects no evidence of bargaining between the parties. Moreover, the Western States employee's handbook implicates no bargained for intentions of the parties. Rather, it embodies company policies and guidelines promulgated by Western States that may or may not be in effect on any given day. As stated in the manual:

> The company reserves the right to change, discontinue or modify all policies, benefits, and procedures currently in effect at the company. The company may effect such changes without notice but will provide employees with supplemental information at the earliest possible date, reflecting those changes.

*See* Roy v. Woonsocket Institution for Sav., 525 A.2d 915 (R.I. 1987) (handbook and manual subject to unilateral alteration or revocation, so employees have no legitimate expectation that any

---

[13]Unfortunately, the majority neglects to mention the fact that in the written acknowledgement by Jones that he had read the handbook in full and that he "understand[s] the policies and rules of conduct contained therein," he also indicates his understanding "that Western States Minerals Corporation will keep me informed of *any subsequent changes in Company policies or rules.*" (Emphasis supplied.) What Jones understood in connection with "*subsequent changes*" is that the handbook plainly states that "[t]he company reserves the right to *change, discontinue* or *modify all* policies, benefits, and procedures currently in effect at the company. The company may effect such changes *without notice* but will provide employees with supplemental information at the earliest possible date, reflecting those changes." (Emphasis added.) Although the majority elects to ignore this unilateral right in Western States to discontinue or change any or all policies or rules without notice to employees, it is nevertheless clear that the reservation of right in the company negates the argument that Jones had a right to *rely* on any aspect of the handbook.

specific policy will remain effective). Far from representing the intent of the parties, the handbook simply constitutes a written repository of company policies and benefits that may vary periodically based upon fluctuating policy decisions by the company. Moreover, even the disciplinary procedures that the majority alludes to as part of the employment contract are clearly unintended to bind Western States to an inflexible agenda that interferes with the truly at-will nature of the employment contract. The majority, in its rigid view of the handbook's discipline procedures, completely disregards the predicate language that states that "[d]iscipline will *normally* follow the steps listed below. . . ." (Emphasis added.) Thus, Western States employees are placed on notice by the manual itself, that any policy or benefit contained therein may be altered or revoked at any time, and that the discipline methodology appearing in the handbook is one that the company will *normally* utilize. I again stress that at no place in the handbook does Western States indicate that termination of employment will occur only for cause. The most unequivocal statements on the subject assert that an employee will not be terminated "without a careful consideration of all the facts involved," and that to "ensure fairness and consistency, no one can be discharged without the approval of the mine manager or his authorized representative." The quoted handbook material reflects policy considerations of a company that, aware of the value of a good employee, has structured a reasonable general approach to discipline problems. It does not purport to constitute a contractual agreement that restricts the company's employment options, including its right to terminate employment relationships without regard for cause.

In a recent case involving essentially the same ingredients as the case before us, the Missouri Supreme Court rejected the so-called "handbook exception" to Missouri's at-will doctrine. The handbook at issue in Johnson v. McDonnell Douglas Corp., 745 S.W.2d 661 (Mo.banc. 1988), contained 42 rules and regulations which, if violated, constituted cause for discipline or discharge. The court in *Johnson* held as follows:

> The essential elements of a valid contract include offer, acceptance, and bargained for consideration. . . . None of these elements are present in this case. McDonnell's unilateral act of publishing its handbook was not a contractual offer to its employees. The handbook was merely an informational statement of McDonnell's self-imposed policies, providing a nonexclusive list of acts for which an employee might be subject to discipline. Several of the rules and regulations in the handbook were couched in general terms and were open to broad discretion and interpretation. The

handbook also provided that the rules were subject to change at any time. Given the general language of the handbook and the employer's reservation of power to alter the handbook, a reasonable at will employee could not interpret its distribution as an offer to modify his at will status . . . . An employer's offer to modify the at will status of his employees must be stated with greater definiteness and clarity than is found here . . . . Since McDonnell Douglas made no offer to its employees, no power of acceptance was created in the plaintiff.

*Id.* at 662-63. *See also* Martin v. Capital Cities Media, Inc., 511 A.2d 830 (Pa.Super. 1986) (employee handbook not evidence of intent to change at-will nature of the employment, and list of actions suitable for discipline was for illustrative purposes only).

Similarly, handbook language reflecting the Western State's interest in promoting job satisfaction and security does not transmute the at-will contract into a contract for "continued employment." It is a well-established rule that representations of "permanent" or "steady" employment do not, without more, alter the status of an employment contract that is otherwise a contract terminable-at-will. As noted in Gonzales v. United Southwest Nat. Bank, 602 P.2d 619 (N.M. 1979):

The rule is uniform that a contract for permanent employment, not supported by any consideration other than performance of duties and payment of wages, is a contract for an indefinite period. It is terminable at the will of either party. A discharge without cause does not constitute a breach of such contract justifying recovery of damages.

*Id.* at 621, quoting from Garza v. United Child Care, Inc., 536 P.2d 1086, 1087 (N.M.Ct.App. 1975). *See also* Edwards v. Citibank, N.A., 418 N.Y.S.2d 269 (1979); Page v. Carolina Coach Co., 667 F.2d 1156 (4th Cir. 1982) (applying Maryland law); Smith v. Board of Education, 708 F.2d 258 (7th Cir. 1983) (applying Illinois law); Price v. Mercury Supply Co., 682 S.W.2d 924 (Tenn.App. 1984); Anderberg v. Georgia Electric Membership Corp., 332 S.E.2d 326 (Ga.App. 1985); Albert v. Davenport Osteopathic Hospital, 385 N.W.2d 237 (Iowa 1986).

I suggest, therefore, that the handbook language providing that employees will have a probationary status during the first 60 days, followed by permanent employee status thereafter, has no effect on the at-will nature of the employment contract with Jones. *See* Bryant v. Southern Screw Machine Products Co., 707 S.W.2d 321 (Ark. 1986) (specified probationary period in handbook, followed by entitlement to company benefits and indication of certain intolerable conduct did not entitle employee to definite

period of employment or termination only for cause). Moreover, in Smith v. Cladianos, 104 Nev. 67, 752 P.2d 233 (1988), we affirmed a summary judgment disallowing a wrongful discharge claim in which the plaintiff had contended that the employee handbook had entitled her to the right to be heard prior to her termination. The handbook in *Cladianos* did state, in pertinent part, that "during this [90-day] probationary period [if] your supervisor feels that you will not be able to meet the qualifications and standards necessary for the job you have to perform, he may terminate your services without prior notice." Clearly, the quoted language of the handbook in *Cladianos* implies that *after* the probationary period, terminations will not occur without prior notice. We nevertheless had no difficulty determining that Smith was an at-will employee who could be terminated at any time with or without cause. Our respected brother Springer, author of the majority opinion in the instant case, also authored the opinion in *Cladianos*.

Admittedly, it is easier to find case authority today that would tend to support the majority's view than in times less recent. *See, e.g.,* Lewis v. Equitable Life Assur. Soc., 389 N.W.2d 876 (Minn. 1986); Woolley v. Hoffman-LaRoche, Inc., 491 A.2d 1257 (1985); Leikvold v. Valley View Community Hospital, 688 P.2d 170 (Ariz. 1984); Allegri v. Providence-St. Margaret Health Center, 684 P.2d 1031 (Kan. 1984). I will not extend this dissent by seeking to distinguish the foregoing cases and others not cited herein, but I do note that in a number of instances, the factual basis for finding an employment contract terminable only for cause is far stronger than in the instant case. Furthermore, I suggest that only in the clearest of cases, where it is apparent that the employer and employee bargained for a set period of employment or a right to hold employment subject to termination only for cause, or the employer has unilaterally made clear its position to be bound by such an intention, should the courts be willing to recognize an action for wrongful termination based in whole or in part upon employee handbooks.

It should be apparent that as the courts increasingly resort to employee handbooks as a basis for finding implied agreements to restrict employers' termination rights under employment contracts otherwise terminable at the will of the parties, employer-employee relationships will change. Even the most benevolent of employers will not be willing to subject themselves to costly litigation and liability exposure stemming from employee handbooks and policy manuals. At the very least, employers will increasingly seek to reduce such exposure by "loading" their handbooks and manuals with language of disclaimer and non-commitment. I do not subscribe to the view that it is better to

force employers to sterilize their handbooks with language making it unmistakably clear that the nature of the employment relationship is strictly at will, and that discipline measures apply solely at the discretion of the employer. I am of the opinion that most employers, certainly the enlightened ones, realize the clear correlation between employee morale and employee productivity. They generally provide handbooks and manuals to inform employees of company policies concerning their employees. I find it difficult to believe that any substantial number of employers would deliberately promulgate their policies to employees with the intention of building a reputation for noncompliance. On balance, I therefore believe that both the work force and employers benefit from the explanatory information disseminated through employee handbooks and manuals. I fear, however, that if the courts persist in transforming employee policy handbooks into contracts for "continued employment," their use will either be discontinued or so severely circumscribed as to impair their value to employee and employer alike.

Although my research has not been exhaustive, it appears that many of the courts in this country would still refuse to interfere with at-will employment contracts on such gossamer grounds as those in the instant case. My position regarding the law in this area has not changed since my dissent in Southwest Gas Corp. v. Ahmad, 99 Nev. 594, 668 P.2d 261 (1983). Today's opinion perpetuates the *Ahmad* rationale with predictable results. Any corporate counsel or retained counsel who fails to protect corporate and other clients from the type of exposure presented by the majority view, may indeed end up as the party ultimately liable for the payment of damages.[14] A law and economics analysis of

---

[14]I note, however, that some courts have positioned themselves to such an extreme that their continued recognition of employment contracts terminable at will appears to be little more than lip service. As an illustration, the majority opinion contains a footnote reference to the case of Foley v. Interactive Data Corp., 765 P.2d 373 (Cal. 1988), as standing for the proposition that "where no explicit agreement of continued employment is entered into, such an agreement can be implied when the employer creates an atmosphere of job security and fair treatment." Counsel may therefore have a difficult task in attempting to protect employer clients from such courts irrespective of their efforts to avoid liability exposure through elimination or careful structuring of employee handbooks and personnel manuals. It would appear from the majority's interpretation of *Foley* that certain courts are inclined to eliminate the at-will doctrine altogether. If employers lose the right to terminate at will simply because they create an "atmosphere of job security and fair treatment," their options are becoming few indeed. It would appear from such a premise that employers would be faced with the absurdity of eliminating or carefully circumscribing handbooks, and adopting a policy of constant oral and written reminder to employees that their job security is tenuous and that they should not expect to receive fair treatment from their

the majority position leaves us with the realistic prospect that employees will ultimately suffer the burdens of today's ruling despite the overtones ostensibly favorable to our working citizens. Employers with middle level management authorized to employ and terminate, will become increasingly unwilling to subject themselves to wrongful discharge actions stemming from alleged violations of contractual rights assertedly traceable to employee handbooks. Under the majority's reasoning, because Jones agreed to abide by the policies contained in the handbook, and because a former management level employee testified (improperly, I suggest) that employees of Western States had a right to rely on the manual, the controversy ends. A contract for "continued employment" is a *fait accompli*. Under this type of reasoning, almost all terminations may be viewed as raising issues of fact suitable for determination at trial. I visualize the inevitable reaction by employers to avoid such vexation and potential liability as an eventual setback for employees.

Jones had no vested right in any of the handbook provisions, and it seems disingenuous to conclude that because he was asked to abide by its terms a contract for continued employment was formed. An employee needs to be informed of his duties and employer policies in one form or another, and the fact that an employer elects to do so through means of a handbook should not, without more, be viewed as a modification of the at-will nature of the employment. Moreover, the former mine manager's testimony that an employee is entitled to rely on the expressions of the handbook is not sufficient to transmute the handbook into a contract for continued employment. Indeed, the reservation of right in the employer to discontinue or modify any of the provisions of the handbook without notice is cogent evidence of the fact that employees could not rely on any of the terms of the manual. At no place in the manual does the employee receive assurances of continued employment and, as previously noted, there is no provision indicating that an employee may be terminated only for cause. I therefore dissent from the majority view that the handbook constituted a contract upon which Jones could rely for continued employment.

Finally, I note that:

---

employer. Unfortunately, in many instances, workers would accept employment under such extreme conditions as a matter of necessity.

I do not doubt that courts embracing the *Foley* type of logic do so for humanitarian reasons and in deference to what they perceive as fundamental fairness. I suggest, however, that if the long established doctrine of employment at will is to be eliminated, its executioner should be legislative bodies rather than courts pretending to acknowledge the doctrine even as they extend themselves to assure its demise. The at-will doctrine should not be abrogated or emasculated by common law courts that are ill-equipped to consider all of the consequences to both labor and management that will result therefrom.

> In general, an employment contract, indefinite as to duration, is terminable-at-will by either the employer or employee. . . . But such a contract for "permanent" or "steady" employment (as opposed to either "temporary" or "lifetime" employment) is terminable by the employer only for just cause if: (1) there is an *implied agreement* to that effect, or (2) the employee gives *consideration in addition to* the contemplated services.

Roberts v. Atlantic Richfield Co., 568 P.2d 764, 768-69 (Wash. 1977). The general rule expressed in *Roberts* places employment contracts in the category of: (1) terminable-at-will; (2) terminable-at-will unless limited by implied agreement to termination for just cause; (3) terminable-at-will unless consideration in addition to the contemplated service is provided by the employee; and (4) contracts for a specified period of time or a lifetime.

I have been unable to find any evidence upon which to conclude that Jones was employed for his lifetime or a specified period of time. Nor do I see any evidence that Jones supplied any consideration for his employment with Western States other than the service he was hired to perform. Jones was therefore subject to termination at will unless there was an implied agreement between the parties that would restrict the employer's right of termination to circumstances constituting just cause. Because the record does not reflect such an agreement, I am unable to accept the majority's conclusion to the contrary.

## TORTIOUS DISCHARGE

Unfortunately, the majority appears to have greatly muddied the waters in this important area of the law by failing to follow the dispositive reasoning of our decision in Sands Regent v. Valgardson, 105 Nev. 436, 777 P.2d 989 (1989). Even though the ink on *Valgardson* is not yet dry, the majority ascribes hastiness or carelessness to that opinion in noting that "we use some possibly misleading language when we said that we did not 'perceive that our public policy against age discrimination is sufficiently strong and compelling to warrant another exception to the "at-will" employment doctrine.' "[15] Such a characterization is strictly teleo-

---

[15]Interestingly, the majority opinion, "upon reflection" concludes that "it is obvious that actions for tortious discharge are not in any sense 'an exception to the "at-will" doctrine,' but, rather, an independent tort action that really has nothing to do with whether there is an at-will or contractual relationship between employer and employee." I suggest that the majority is wrong. Public policy considerations do create the basis for exceptions to the at-will doctrine that would otherwise leave employers unfettered in their right to discharge at-will employees. Thus, in Hansen v. Harrah's, 100 Nev. 60, 675 P.2d 394 (1984), this court recognized that "[m]any other states . . .

logical, a subtle substitute for an outright overruling of the court's position in *Valgardson*.

The *Valgardson* language the majority now seeks to attenuate was the product of deliberation based upon legislative assessment of the subject. Without question, the legislature established a public policy against age discrimination in employment and determined statutorily the extent of that policy by prescribing the damages available for its violation.[16] This case is no different.

In *Valgardson* we determined that inasmuch as a statutory remedy was provided for persons aggrieved by employment discrimination based upon age, no civil action for tortious discharge was available to the plaintiffs. The identical determination should be made here. Under the Nevada Occupational Safety and Health Act (NOSHA), Western States was obligated not to "[r]equire, permit or suffer any employee to go or be in any employment or place of employment which is not safe and healthful." NRS 618.385(1).[17] The employer is also under a duty not to "[f]ail or

---

have also adopted or recognized *a public policy exception to the at-will rule* making retaliatory discharge for filing a workmen's compensation claim actionable in tort." *Id.* at 64, 675 P.2d at 396, citing cases (emphasis added). If other than at-will employment contracts are entered into in violation of public policy, such contracts would, at least to the extent of such violation, be unlawful and void. Public policy violations constitute a basis for interfering with, i.e., excepting an employer's right to whimsically discharge vulnerable at-will employees because the exercise of such rights in violation of public policy would effectively frustrate societal expectancies derived from public policy.

[16]A cursory reading of *Valgardson* will dispel any notions that this court failed to speak advisedly in declaring that age discrimination in employment was *not sufficiently strong and compelling* "to warrant another exception to the 'at-will' employment doctrine." *Valgardson,* 105 Nev. at 440, 777 P.2d at 900. Indeed, in connection with our ruling on the subject, we cited several cases, including Fischer v. Sears, Roebuck & Co., 687 P.2d 587 (Ida.App. 1984), summarizing the holding of the latter case as "'[t]he duty not to discharge an employee because of age is solely a creature of statute; no such duty existed at common-law which would allow prosecution of a claim for wrongful discharge from employment because of age.'" *Valgardson,* 105 Nev. at 440 n.4, 777 P.2d at 900, n.4. Furthermore, in *Valgardson* we observed, as we should in the instant case, that "the Legislature has addressed the gravity of violating Nevada's public policy against age discrimination by defining the extent of the remedy available to parties injured by such discrimination." *Id.* at 440, 777 P.2d at 900. Finally, we also declared that "public policy tortious discharge actions are severely limited to those rare and exceptional cases where the employer's conduct violates strong and compelling public policy." *Id.* it is thus seen that much of the thrust of the *Valgardson* decision was based on the very determination that the majority now seeks to disavow as "misleading."

[17]Western States has forcefully argued that the claims filed by Jones in state court were preempted by the Federal Coal Mine Health and Safety Act of 1969 (30 USC §§ 801, et seq.). I do not agree. Jones' problem did not involve hazardous or unsafe working conditions at the job site. Rather, it

neglect to do every other thing reasonably necessary to protect the life, safety, and health of such employees." NRS 618.385(3). Clearly, the two quoted provisions of NOSHA apply here. Western States sought to have Jones enter an employment area that was unhealthy *for him* because of his recent surgery. The employer also failed or neglected to consider Jones' health and safety in attempting to induce him to work in an environment that was unsuited to his state of health.

NOSHA also provides a statutory remedy to an aggrieved employee who is discharged for refusing to comply with an employer's attempted disregard or violation of the Act. NRS 618.445 specifies the procedure and remedy applicable in cases such as the one now before us.[18] Under our reasoning in *Valgard-*

---

involved an employer attempting to force Jones to work under conditions that were unsafe and unhealthy *because of Jones' unhealed surgical wound.* The federal government would have had no interest in assuming jurisdiction under the Mine Safety Act for a situation that was unrelated to unsafe or hazardous working conditions and that was covered by the state OSHA statutes.

[18]As noted in the text of this dissent, NRS 618.385 specifies certain duties and prohibitions applicable to employers. The presence of such duties and prohibitions in the statute obviously creates correlative rights in employees not to be induced or coerced into working under conditions violative of the statute. In the instant case, Jones sought to exercise his right not to be forced into an unsafe place of work and was terminated as a result. Jones' unsuccessful attempt to assert his right provided him a basis for invoking the statutory remedy available under NRS 618.445. The latter statute reads, in its entirety, as follows:

1. A person shall not discharge or in any manner discriminate against any employee because the employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding or because of the exercise by the employee on behalf of himself or others of any right afforded by this chapter.

2. Any employee aggrieved by a violation of subsection 1 may file a complaint for relief afforded under subsection 3, after first notifying his employer and the division of his intention to file the complaint. Any complaint must be filed with the division within 30 days after the violation has occurred and must set forth in writing the facts constituting the violation.

3. Upon receipt of the complaint by the division, the administrator shall cause such investigation to be made as he deems appropriate. If upon investigation, the administrator determines that the provisions of subsection 1 have been violated, he shall bring an action in any appropriate district court against the person who has committed the violation.

4. If the court finds that the employee was discharged or discriminated against in violation of subsection 1, the employee is entitled to reinstatement and reimbursement for lost wages and work benefits.

5. Any decision reached by the administrator relating to the filing of an action under this section must be made available to the complaining employee within 90 days from the division's receipt of the complaint.

*son,* because the legislature has declared both the public policy and the remedy for its violation, a tortious discharge action should be unavailable.

NRS 618.445(1) prohibits an employer from discharging an employee for exercising any right under Chapter 618. Courts have interpreted the federal and state OSHA statutes to include a right assertible by employees to refuse unsafe or unhealthful employment. Whirlpool Corp. v. Marshall, 445 U.S. 1 (1980). *See also,* Ohlsen v. DST Indus., Inc., 314 N.W.2d 699 (Mich.App. 1981); Marshall v. N.L. Indus., Inc., 618 F.2d 1220 (7th Cir. 1980). Thus, Jones enjoyed the right not to accede to exposure to unsafe or unhealthy working conditions. NRS 618.385(1) and (3). He was discharged for exercising that right, in contravention of NRS 618.445(1). Jones was therefore protected by the Act and entitled to the remedial provisions of NRS 618.445.

It is precisely because Nevada statutory law provided a remedy for the aggrieved plaintiffs in *Valgardson* that we declined to recognize the availability of common law remedies in age discrimination cases. We specifically held that "the Legislature has addressed the gravity of violating Nevada's public policy against age discrimination by defining *the extent of the remedy available to parties injured by such discrimination." Valgardson,* 105 Nev. at 440, 777 P.2d at 900 (emphasis added). I suggest, therefore, that at least when *Valgardson* was decided, this court determined that public policy violations occurring in at-will employment terminations would not provide a basis for tortious discharge damages whenever the legislature provides a legal remedy for such violations. Our deference in *Valgardson* to the exclusivity of the statutory remedy is not without precedent. In Braun v. Kelsey-Hayes Co., 635 F.Supp. 75 (E.D.Pa. 1986), the plaintiff accused the defendant of purposely violating federal and state safety and health statutes. In rejecting the plaintiff's action for wrongful discharge in violation of the public policy of Pennsylvania, the court declared that the "statutory remedy is exclusive and preemptive of any state tort action." *Id.* at 80. Continuing, the court held that "a claim for wrongful discharge under common law may only be maintained in the absence of a statutory remedy . . . [and that] the 'only Pennsylvania cases applying the public policy exceptions [to create a wrongful discharge claim] have done so where no statutory remedies were available'" (quoting from Wolk v. Saks Fifth Ave., Inc., 728 F.2d 221 (3d Cir. 1984)). *Id.*

Similarly, in Walsh v. Consolidated Freightways, Inc., 563 P.2d 1205 (Or. 1977), the Supreme Court of Oregon held that plaintiff could not maintain a wrongful discharge action because

of the remedies provided under OSHA, despite the fact that the plaintiff never reported or threatened to report the alleged safety hazards to OSHA.

The majority attempts to distinguish *Valgardson* by stating that the plaintiffs there received tort damages, a remedy unavailable under NOSHA. I suggest that the majority is mistaken. In support of the conclusion that the plaintiffs in *Valgardson* recovered tort damages, the majority cited at length the case of Rickel v. C.I.R., 900 F.2d 655 (3rd Cir. 1990). The *Rickel* court explained that its holding was limited only to a determination that for purposes of the Internal Revenue Code, an ADEA action for age discrimination was "a personal injury and an ADEA action to redress that injury is more like the assertion of a tort type right." *Id.* at 663, n.13. Moreover, the *Rickel* opinion stated that it was not suggesting that an ADEA action did not possess "contract type features," nor did it overrule an earlier case, Rogers v. Exxon Research & Eng'g Co., 550 F.2d 834 (3rd Cir. 1977), which concluded, albeit "gratuitously" that an ADEA action was a "routine contract action." *Rickel*, 900 F.2d at 663, n.13, quoting from *Rogers*, 550 F.2d at 838-39.

In the case of Thompson v. C.I.R., 866 F.2d 709 (4th Cir. 1989), the court determined that in a federal action under the Equal Pay Act and Title VII for the difference between wages received and the wages that should have been paid absent the discrimination, the claim for back pay was a contractual claim. In particular, the *Thompson* court held that "[t]he back pay award was simply recovery for earned, but unpaid, wages which distinguishes her award of back pay from awards for lost wages or lost income in traditional personal injury/tort actions. She [Thompson] received compensation for services rendered *whereas a tort plaintiff receives compensation for the inability to earn an income due to the tortious action of a defendant." Id.* at 712 (emphasis supplied). In *Valgardson* the plaintiffs recovered back pay pursuant to the statutory remedy available under NRS 613.420 and NRS 233.170. In addition, plaintiffs received an additional equal amount *as liquidated damages* pursuant to the provisions of the ADEA upon proof of willfulness. The former damages allowed under the Nevada statutes are of a contractual nature, and the ADEA recovery was of a punitive, rather than a tortious nature. As the *Rickel* court observed, citing Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 125 (1985), "the 'legislative history of the ADEA indicates that Congress intended for liquidated damages to be punitive in nature.'" *Rickel*, 900 F.2d at 666. The *Rickel* court further declared that "[s]ince the plaintiff's recovery of liquidated damages is not based on the extent of the taxpayer's injury but instead the employer's degree of culpability, the

Court's [United States Supreme Court] interpretation of the legislative history seems to comport with the statute's structure. Furthermore, at least one court has characterized liquidated damages under the ADEA as punitive. Kelly v. American Standard, Inc., 640 F.2d 974, 979 (9th Cir. 1981)."

I have burdened this dissent with a discussion of the nature of the damages recovered in *Valgardson* only because the majority has sought to distinguish the instant case from *Valgardson* solely on the basis that under *Valgardson* the plaintiffs were able to recover tort damages whereas Jones has been deprived of a tort remedy under the NOSHA statute. This court made no reference whatsoever to the nature of the damages available to the plaintiffs in *Valgardson*. To the contrary, in *Valgardson* the entire thrust of the opinion concerning the availability of damages was directed to the point that because the legislature had defined the *extent* (rather than the *nature*) of the remedy, a common law action for tortious discharge was not an option.

In summary, then, it must be seen that the instant case is indistinguishable from *Valgardson*. In the latter case, tort damages were unavailable and we refused to permit the maintenance of a cause of action based upon common law. The statutory remedy, reflecting the extent to which the legislature considered age discrimination in employment violative of Nevada's public policy, was held to be exclusive. Here, Jones was afforded a statutory remedy which reflected the legislature's position concerning both public policy and the extent to which relief is available for its violation. In *Valgardson,* a unanimous opinion, it appeared that the law on this subject was settled, and that "public policy tortious discharge actions . . . [were] severely limited to those rare and exceptional cases where the employer's conduct violates strong and compelling public policy" and where statutory remedies were absent. *Valgardson,* 105 Nev. at 440, 777 P.2d at 900. By today's ruling, which does not purport to overrule *Valgardson,* the majority has disregarded the principle of *stare decisis* and created confusion and uncertainty in the law which must leave both employers and employees in a state of wonderment.

For the reasons set forth above, I am of the opinion that Jones was not entitled to prevail under theories of breach of contract of continued employment and tortious discharge.

## THE STATUTORY REMEDY

This court has previously determined that NOSHA does not confer upon an employee a private right of action. Frith v. Harrah South Shore Corp., 92 Nev. 447, 552 P.2d 337 (1976). Indeed, the statutory procedure for obtaining redress provides that an

aggrieved employee *must* file his or her complaint *with the division* (the Division of Occupational Safety and Health of the Department of Industrial Relations). NRS 618.445(2). Thereafter, if an action is deemed warranted, the administrator of the division must file an action on behalf of the employee. NRS 618.445(3). Finally, if the district court in which the action is filed determines that the employee was discharged or discriminated against in violation of the Act, the employee is entitled to reinstatement and reimbursement for lost wages and benefits. NRS 618.445(4).

Obviously, Jones consciously or unconsciously bypassed the statutory procedure which clearly applied in the circumstances of his case, and pursued his own action. Under case authority represented by Ohlsen v. DST Indus., Inc., 314 N.W.2d 699 (Mich.App. 1981), the remedy supplied by MIOSHA was held to be exclusive. The "plaintiff's failure to exhaust that administrative remedy was fatal to his cause of action." *Id.* at 702. Under section 5 of NRS 618.445, the administrator is required to give the employee notice of his decision concerning the filing of an action within 90 days from the date the division received the employee's complaint. I must conclude from that provision that the legislature did not intend to preclude the filing of a complaint in district court by the employee in the event the administrator declined to do so. Nevertheless, I am of the opinion that the legislature intended that employees first exhaust the administrative procedure set forth in the statute before proceeding with their own actions. In so doing, the administrator's investigation and activities may either prompt an early settlement of the dispute at minimum cost to both employee and employer, or discourage costly litigation by determining that an employee's complaint is lacking in merit.

By virtue of the foregoing, I do not believe that Jones' award of damages may be upheld under any theory at this point. I suggest, however, that Jones may still be able to resort to the statutory procedure based upon a theory of equitable tolling. Such a determination would have to be made by the district court at a hearing scheduled for that purpose. It is certainly arguable that Jones gave timely notice of his grievance by the complaint he filed in district court, and that the evidence already gathered through that action will minimize the prejudice that could have otherwise occurred because of delay resulting in the unavailability of evidence. Moreover, the public policy interests of the state would be advanced by an equitable intervention that would enable Jones to obtain his remedial entitlements under the Act.

For reasons previously expressed, I do not agree with either the result or the legal reasoning of the majority. I believe that the

law of this jurisdiction is disserved by the majority's disregard of this court's recent precedent in *Valgardson,* and must therefore dissent. I would reverse the judgment in its entirety and anticipate that Jones would thereafter seek to pursue the remedy accorded him under NOSHA.

## POSTSCRIPT

The need to prioritize time and resources forces me to address the latest changes in the majority opinion separately and without again revising my completed dissent. Recognizing the total lack of precedential value in a dissent, I am also prompted to avoid further delay in the issuance of these dispositions by taking the time to walk anew over paths painstakingly travelled and described over too many previous occasions. Moreover, a review of the above material may cause the reader to understand why I do not believe these dispositions to be sound or logical extensions of our existing law. Unfortunately, use of this expedient will not be without cost to context, because certain of my "responses" will no longer track the latest majority opinion with its additions, deletions and changes. In addition, this "postscript" will, of necessity, be somewhat disjointed, as it is my intention to limit my comments here to certain aspects of the current majority opinion that I deem worthy of analysis.

### D'ANGELO v. GARDNER, ET AL., DOCKET NO. 20452

The majority states that the D'Angelo case and the case of Southwest Gas Corp. v. Ahmad, 99 Nev. 594, 668 P.2d 261 (1983), are "virtually identical."[19] I suggest that an objective comparison will reveal little similarity between the two beyond the fact that they both belong to the same genus. In the first place, *Ahmad* came to this court on appeal from a judgment after a bench trial. D'Angelo's appeal is from summary judgment. Secondly, the handbook at issue in *Ahmad* specified that "[a] regular employee may not be terminated without cause." There is no similar provision in either of the GEMCO handbooks. Moreover, the Southwest Gas handbook in *Ahmad* provided a structured discipline procedure which involved notice of unsatisfactory performance *and a period of time within which to correct the deficiencies in performance.* Here, the GEMCO handbook provided for no corrective period after notice of a failure to perform. Finally, without exhausting the differences between the two cases, *Ahmad* involved a termination for deficient job perform-

---

[19]After circulating this latest dissent, the majority deleted its characterization of D'Angelo's case and *Ahmad* as being "virtually identical." In the interest of time, I elect not to modify my comments addressing the earlier majority position.

ance. In D'Angelo's case, termination occurred as a result of a determination of employee dishonesty.

In view of the foregoing, it is indeed difficult to accept the majority's conclusion that an affirmance of the district court's summary judgment against D'Angelo would require an overruling of *Ahmad*. In that regard, it is both enlightening and frustrating to compare the majority's position in D'Angelo's case with this court's opinion in Smith v. Cladianos, 104 Nev. 67, 752 P.2d 233 (1988). The latter appeal was also from a grant of summary judgment against the allegedly aggrieved employee who invoked all of D'Angelo's arguments in an attempt to secure relief. In *Cladianos*, JUSTICE SPRINGER wrote that "[e]ven if we were to consider the provisions of the employee handbook as part of Smith's employment contract with the Sands, no provision in the handbook modifies the Sands' common law right to discharge Smith at its whim." *Id.* at 68, 752 P.2d at 234.[20] Similarly, no provision can be identified in the GEMCO handbook that suggests a modification in GEMCO's common law right to discharge D'Angelo at its whim. The *Cladianos* court quite properly concluded that "it was not error for the district court to find the absence of any procedure either spelled out or guaranteed in the handbook which would restrict the Sands' at-will employment termination rights." *Id.* at 69, 752 P.2d at 235.[21]

---

[20]The Honorable J. Charles Thompson, the respected district court judge who entered summary judgment against D'Angelo below, correctly cited *Cladianos* in support of his incisive ruling:

> Plaintiff claims that he is not an at-will employee and could not be discharged unless he received progressive counseling or was discharged for cause. The voluminous material submitted to this Court does not support this contention. The employment manual contains a list of work rules (two of which defendant says plaintiff violated) and asserts that "deviations from these rules are always considered most serious and are deemed by the Company to be proper cause for discharge." Plaintiff insists that this provision contractually restricts defendant's ability to discharge him. *To the contrary, the plain language simply makes it clear that the listed offenses are sufficient for termination, not that defendant's common law right to discharge plaintiff has in any way been changed. D'Angelo was an at-will employee.*

(Emphasis added.)

[21]The Sands' handbook at issue in *Cladianos* contained a provision that was more compelling than anything found in either of the GEMCO handbooks as a basis for an argument for an alteration of the at-will employment relationship. The Sands' manual specified that "at any time during this [90-day] probationary period your supervisor feels that you will not be able to meet the qualifications and standards necessary for the job you have to perform, he may terminate your services without prior notice." The single inference derivable from the quoted provision is that *after* the probationary period has ended, termination may not occur without providing prior notice to the employee. No declaration of such unlimited application is contained

The majority disavows the characterization of the effect of its opinion in this dissent that "any determination by [an employer] to terminate an employee is contestable before a jury as a final arbiter of 'proper cause.'" The majority also claims that "proper cause" is not an issue in this case. I most certainly agree that proper cause should not be an issue on this appeal from summary judgment, but suggest that the majority's view of the nature and effect of its holding is sadly myopic. If, on this record, D'Angelo is entitled to have a jury determine whether his at-will employment has been contractually modified, and whether, after the extent to which GEMCO investigated D'Angelo's conduct prior to discharging him, the employer had proper cause to terminate, there is little doubt in my mind that any determination by an employer to terminate an employee is contestable before a jury as a final arbiter of the nature of the employment relationship and whether the discharge was justified. Having thus concluded, I stress again that I have grave doubts that this court's unwarranted interference with employment relationships under the law as it existed prior to today's opinion will redound favorably to either labor or management.

Although the majority has reacted to this dissent by deleting from its opinion the word "petty" as its characterization of the incident that resulted in D'Angelo's discharge, the majority's determination to minify the incident remains. Distorting the record facts, the majority describes the basis for D'Angelo's termination as "selling some film *at a few cents less than the marked price.*"[22] (Emphasis mine.) Of course, the majority knows that the evidence reflects that D'Angelo, if he discounted

---

within the GEMCO manuals. The provision in the GEMCO handbook that refers to notice indicates that after the trial period any discharge "based on an employee's failure to perform work as required" will have been preceded by a written notice identifying the deficiencies. Of course, I do not contend that *Cladianos* was wrongly decided; I merely note that if an employment handbook is to be construed as a contract that alters the at-will status of employees merely because it contains a clause specifying notice prior to termination, the unrestricted notice specification irrefutably inferred in the Sands' manual provided a stronger basis for that result than the manual in the instant case.

[22]Again, the majority changed its opinion after receiving my latest dissent to delete its earlier statement that D'Angelo was accused of selling some film "at a few cents less than the marked price." The majority has then, in two successive revisions of its opinions, deleted its first characterization of the incident prompting D'Angelo's termination as "petty," and now its minified description of the magnitude of the discount. For reasons repeated elsewhere, I will not again delay the issuance of these opinions by undertaking another revision of my dissent. I suggest, however, that despite turning off the "tune" the melody lingers on. The majority's previously written expression of its attitude concerning the "petty" nature of D'Angelo's actions explains, as do the remarks from the bench, much of the rationale for the decision where adherence to legal precedent could not.

the current film at all, did so by almost fifty percent, i.e., from a regular price of $3.97 per roll to an unauthorized price of $2.00 per roll. I suggest that the majority's characterization of the discount as "a few cents" accurately reflects an attitude that impacts directly on the "nonissue" of proper cause. The majority's perception of the "incident" is further reflected by the widely publicized comments from the bench that places the entire perspective of GEMCO's entitlements within the framework of a principle involving a twelve-year employee who was "axed" for "twenty bucks."

It must thus be seen that "proper cause" has been made a critical issue by the majority despite its protestations to the contrary. Even if one were to accept, arguendo, the majority's determination that the complex of facts and circumstances "all tend to lead to the conclusion that the employment relationship was defined by the handbook and that both parties considered themselves bound by the handbook with reference to termination rights and processes,"[23] the majority may have irreparably tainted the critical sequential issue of proper cause. Obviously, if the jury determines that GEMCO could terminate D'Angelo's employment only for cause, then the dispositive issue becomes whether GEMCO in fact had proper cause for the termination. The majority has already cast GEMCO's termination of D'Angelo in a pejorative light by publicly characterizing the incident in such terms as "only a few cents," "so we're here over twenty bucks," being "axed" for "twenty bucks" after service equaling "three times the terms of the President of the United States," "is this the decent thing to do," "is this what at-will employment means, that you can do this to employees," and "are they [employees] a bag of oats?" None of these characterizations has anything to do with the issue concerning the nature of the employment relationship between D'Angelo and GEMCO. To the

---

[23]I again emphasize that the majority has identified no "termination rights and processes" in either of the GEMCO handbooks simply because they do not exist. The fact that GEMCO indicated that in instances of deficient performance a termination will be (*not* "must be" as indicated by the majority) preceded by written notice, does not translate into any form of actionable "right" in an employee. There were no provisions for a curative period after notice and no procedures or "processes" whatsoever concerning employee terminations. GEMCO's policy expression indicating that employees terminated for failure to perform work as required will be given written notice prior to termination, was substantially followed in this case as D'Angelo clearly understood that his conduct involving the sale of the film to his friend was being carefully scrutinized prior to his discharge, and that providing the unauthorized discount to his friend in direct violation of a company rule prohibiting such a discount was the primary cause of his termination. Moreover, the policy representation concerning written notice prior to termination had no application here, as D'Angelo was being discharged for a deliberate act of dishonesty rather than a failure to perform work as required.

contrary, all relate to the question of proper cause—whether, assuming a contract for "continuing employment," GEMCO's termination of D'Angelo conformed to a proper cause standard. GEMCO, who even had the percipient employee-witnesses to D'Angelo's transaction with his friend tested by polygraph before discharging D'Angelo, has now been placed in the difficult position of proving good cause in the face of the above publicly stated value judgments by members of this court. I submit, therefore, that it is utterly unrealistic to conclude, as the majority does, that proper cause is not an issue in this appeal. The majority has made it an issue, if not a foregone conclusion.

## WESTERN STATES MINERALS CORP. v. JONES, DOCKET NO. 19697

The latest majority opinion makes ongoing references to the Honorable Joseph O. McDaniel and his determinations. Although I have not found record evidence of a new trial motion having been filed or an appeal from the denial of such a motion that would lend credence to the majority's attribution to Judge McDaniel of "upholding the jury's finding of contractual liability in this case," I nevertheless have little doubt that the respected judge would have left the jury's verdict intact in the face of such a motion. I have great respect for Judge McDaniel and his basic humanity and sense of fairness. It is therefore understandable why the majority would seek to enhance the credibility of its ruling by specifically referring to the good judge. Moreover, as I have previously stated, it is clear to me on this record that Jones was improperly discharged and deserving of redress. However, appellate courts have an obligation to see that the law has been properly followed and that prejudicial error occurring at trial is properly recognized and remedied. I dissent from the majority's ruling not because of a disagreement with Jones' entitlement to relief; my disagreement stems from both the nature of the relief granted and the legal precedent established by the majority opinion.

The majority indicates that under the terms of the amended handbook the discharge procedures could be bypassed "only if" "the employee commits an offense so serious that immediate discharge without prior warning is appropriate." What the handbook actually states, in appropriate and accurate context is:

> Discipline will *normally* follow the steps listed below, although deliberate or serious violations of established rules may necessitate more strict disciplinary action, such as immediate termination.
>
> . . . .
>
> As indicated above, one or more of the steps in the disciplinary process *may be bypassed if,* after a thorough

review of the facts, it is clear that the violation is so serious that it demands equivalent discipline.

(Emphasis added.) It is thus fairly seen that the "only if" characterization by the majority is hardly warranted by the actual handbook language.

The majority also states, without attributing support to the record, that the handbook was changed to include detailed procedures relating to employee discipline and dismissal. The inference the majority provides is that the handbook was modified in order to conform to the intendment of the employee application form that at-will employment be eliminated. I have been unable to find evidential support in the record that would confirm the inference tendered by the majority. Moreover, even if the handbook was amended to provide detailed disciplinary procedures, it is clear that such procedures were unilateral and not the subject of bargaining between the parties. It is also clear, as previously mentioned, that no Western States employee had any vested interest in the specified discipline procedure, as the manual expressly reserved the right to "change, discontinue or modify all policies, benefits, and procedures currently in effect at the company" without notice.

Finally, the majority now takes the position that the statutory remedy provided under NRS 618.445 is permissive and not mandatory, thus concluding that other remedies may be pursued. I suggest that the observation is without substance. Of course the remedy is permissive. No one in Jones' position is required to file a complaint, just as employees entitled to file workmen's compensation claims are not compelled by law to do so. However, as previously noted, if an employee elects to complain, NRS 618.445(2) specifies that "[a]ny complaint *must be* filed with the division. . . ." (Emphasis added.) The majority is equally unpersuasive in stating that since the legislature did not label the NOSHA remedy as exclusive (as it did in workmen's compensation cases), other remedies are not foreclosed. In Sands Regent v. Valgardson, 105 Nev. 436, 777 P.2d 898 (1989), we declared that "the Legislature has addressed the gravity of violating Nevada's public policy against age discrimination by defining the extent of the remedy available to parties injured by such discrimination." *Id.* at 440, 777 P.2d at 900. In *Valgardson,* as here, the statutes at issue did not declare the statutory remedy to be exclusive.

## SECOND POSTSCRIPT

Forty days have elapsed between the time my previous "final dissent" was circulated among the members of the court and the time of the circulation of the concurring opinion by MOWBRAY, C. J. Although the temptation to respond in detail to my colleague's concurring remarks was understandably great, I have no

wish to further delay the issuance of these long-awaited opinions. I will therefore be brief and restrained.

I am saddened to be perceived by my colleague as having insidious[24] motives concerning our men and women who earn their living by the sweat of their brows. In truth, my own family background and personal work history have given me cause to genuinely appreciate both the concerns and contributions of our working classes in society. I trust that those who read my dissent with an open mind will find, whether they agree or not with my analysis and conclusions, that I am hardly motivated by an animus for our working men and women in general, or Messrs. D'Angelo and Jones in particular. As far as my "apocalyptic predictions" and "misplaced and fanciful fears" are concerned, I hope for the sake of all concerned that my colleague is accurate in his assessment.

Finally, I, too, reject the notion that justice is an irrelevant consideration by a court of law in any of its functions. Unfortunately, justice is rarely more than an illusion when dispensed without regard for the law.

## CONCLUSION

I have found no basis in our law or in the records of the consolidated cases for sustaining the reasoning or the results of the majority's opinion. Accordingly, I dissent.

---

[24]In ascribing to this dissenting justice "insidious motives," the concurring justice has relied (at least ostensibly) upon his or someone's misperception concerning the import of the statutes cited and quoted in my dissent. Thus, the conclusion which purports to reveal the error of my ways and my antagonism towards our working classes is that NRS 618.445(2) is irrelevant to the instant *Jones* case, because the statutory remedy is "a right of reinstatement for workers who have been discharged for filing a complaint, testifying in a proceeding, or exercising a right afforded by NOSHA." Unfortunately, my colleague overlooks the meaning of the last phrase "exercising a right afforded by NOSHA." Jones properly sought to avoid being forced to work in a place that would be unsafe and unhealthy during the time when his surgical wound was still in the process of healing. NRS 618.385(1) forbade Western States from requiring, permitting or suffering "any employee to go or be in any employment or place of employment which is not safe and healthful." As I observed in dissent, Western States violated the latter statute, and wrongfully terminated Jones as a result of his refusal to accede to his employer's statutorily prohibited demands. Thus, Jones, in strict accordance with the provisions of NRS 618.445(1), exercised the right "afforded by this chapter [NRS 618]" not to allow his employer to force him to work under unhealthy conditions. The remedy accorded Jones by statute is thereafter set forth in NRS 618.445, subsections (2) through (5). Several courts, and I cited to one in my dissent, have held that the statutory remedy specified by the OSHA statutes is exclusive. I would hope that their motives were not similarly impugned. Finally, I trust that others who take the time to objectively read the dissent, will note that neither JUSTICE YOUNG nor I foreclosed an avenue of relief for Mr. Jones.